[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**December 1, 2005**
**THOMAS K. KAHN**
**CLERK**

No. 05-10228
Non-Argument Calendar
_____

Agency Nos. A79-498-218
& A79-498-217

JOHANA LUCIA GALEANO,
CARLOS ALBERTO GOMEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(December 1, 2005)**

Before MARCUS, WILSON and FAY, Circuit Judges.

PER CURIAM:

Johana Lucia Galeano, through counsel, petitions this Court for review of the Board of Immigration Appeals ("BIA's") order, affirming the immigration judge's ("IJ's") denial of asylum and withholding of removal under the Immigration and Nationality Act ("INA"), and of relief under the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[1] Galeano argues on appeal that neither the IJ's adverse credibility determination, nor the IJ's alternative determination that the petitioners did not establish statutory eligibility for asylum or withholding of removal was supported by substantial evidence in the record. For the reasons set forth more fully below, we deny the petitioners' petition for review.

On March 9, 2001, Galeano, a native and citizen of Colombia, entered the United States as a non-immigrant visitor for pleasure, with authorization to remain in the United States for a period not to exceed June 9, 2001. On September 26, 2001, Galeano, who had remained in the United States, filed an application for asylum and withholding of removal under the INA , along with an attached

---

[1] To the extent the petitioners are appealing the IJ's denial of CAT relief, they failed to exhaust their administrative remedies by challenging this denial in their appeal to the BIA. We, therefore, lack jurisdiction to review any challenges to the IJ's denial of CAT relief. See Taylor v. United States, 396 F.3d 1322, 1327 (11th Cir. 2005) (holding that "[a] court may review a final order of removal only if 'the alien has exhausted all administrative remedies available to the alien as of right'" (quoting 8 U.S.C. § 1252(d)(1)); see also Fernandez-Bernal v. Att'y Gen. of U.S., 257 F.3d 1304, 1317 n.13 (11th Cir. 2001) (interpreting this exhaustion requirement as jurisdictional).

narrative addendum.[2] Galeano asserted in her application that, if she returned to Colombia, she would be persecuted by paramilitaries on account of her membership in a particular social group and her political opinion as a member of the Liberal Party. As part of her application, Galeano cited to several instances that she alleged constituted past persecution, including that, in the beginning of 2001, her father had received at work threatening phone calls.

In October 2002, the Immigration and Naturalization Service ("INS")[3] served Galeano and her husband with notices to appear ("NTAs"), charging them with removability, pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1101(a)(15), for remaining in the United States for a period longer than permitted. Galeano appeared before an IJ and, through counsel, admitted the facts contained in her NTA and conceded removability. After Galeano declined to designate a country of removal, the IJ designated Colombia.

---

[2] Galeano also included in her application for relief her husband, Carlos Alberto Gomez, who entered the United States for pleasure on June 11, 1999, with permission to remain in the United States until December 10, 1999. References in this opinion to Galeano, the lead petitioner, also will include her husband.

[3] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. Because this case was initiated while the INS still was in existence, this opinion refers to the agency as the INS.

In October 2003, at a hearing on Galeano's application for relief from removal, Galeano, who was 24 years' old at the time of the hearing and the sole witness, offered the following testimony. Galeano had a four-year-old daughter who was living in Cali, Colombia with her husband's mother. Galeano also had a brother and sister who resided in Tulua, Colombia, a brother who lived in Medellin, Colombia, and a sister who resided in Canada.[4] When Galeano lived in Colombia, she resided with her parents in Tulua, which was approximately an hour-and-a-half drive from Cali. Galeano's family owned a veterinarian's product store and a home in Tulua, as well as a farm in Monteloro, Colombia. Galeano routinely traveled from Tulua to Cali, where she would visit her husband and attend classes at the Santiago de Cali University, at which she enrolled in 1996 to study economics.[5]

In March 1999, Galeano became an active member of the Liberal Party in Colombia. As a Community Projects Coordinator, Galeano taught the Liberal Party's "philosophy" in Monteloro, Bentioleros, and La Punta la Coka—towns in

---

[4] Galeano testified that, at the time of the hearing, her sister had been granted asylum in Canada. Although Galeano also attempted to introduce during her hearing a document that allegedly corroborated this testimony, the IJ refused to admit this document because it was not translated. Galeano has abandoned our review of this decision by not challenging it in her appeal brief. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that, "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned").

[5] Galeano and her husband, Gomez, were not married until April 2001, after both of them had entered the United States.

Colombia that also were approximately an hour-and-a-half drive from her family's home in Tulua.[6] In June 1999, either members of a guerilla party or the paramilitary approached her Liberal Party group, threatened them, and instructed them to leave the area.[7] Although this event scared Galeano, and she filed a police report, she continued with her activities and nothing resulted from her report. Moreover, in August 1999, while Galeano and her family were enjoying a day at their farm in Monteloro, some of the farm workers informed her family that "a terrorist group" was nearby, and her family left the area. Galeano subsequently learned that, after her family left the farm, members of the paramilitary had arrived and had interrogated the farm workers about Galeano's "work in the zone" and her "political affiliation."

---

[6] In Galeano's application for relief, she elaborated that her duties as a Community Project Coordinator included attending weekly organizational meetings; organizing and executing social projects in the community; advertising and promoting the Liberal Party; providing assistance to persons who had suffered violence; and directing programs for, and educating, women who were heads of their households. Galeano submitted into evidence copies of (1) her identification card with the Liberal Party; and (2) a signed letter by the Liberal Party's President, which included that Galeano was an asset to the party, and that her departure from Colombia was related to "security reasons due to the risk she ha[d] found herself lately." In addition, Galeano submitted a certification from a Tulua municipal agent, which confirmed her role as a leader in the community and included that her father had informed the agent that Galeano had left the country because she had received a death threat.

[7] Although Galeano first identified the persons who approached her group as guerillas, on further questioning by the IJ, Galeano stated that these persons, in fact, were paramilitaries. Galeano further clarified that the zone where her group was located had both guerillas and paramilitaries operating within it.

Starting in early 2000, persons who identified themselves as paramilitaries called Galeano at her family's home in Tulua on three occasions, during which calls they threatened her.[8] In the first phone call, which Galeano received either in January or February 2000, the caller told Galeano to "stop giving ideas to those people," along with informing her that her life, otherwise, "would be short." In April 2000, before Galeano received the second threatening phone call, a man in a vehicle pulled up beside her as she was walking home from a party meeting in Tulua, identified himself as a paramilitary member, told Galeano that her "days were counted" and her life "was going to be very short," and called her a "bastard." Although this encounter frightened Galeano, she neither reported it to the police nor her family. Approximately six months after the first threatening call,[9] Galeano received a second call from a person purporting to be an alleged member of the paramilitary who accused her of "hiding those boxes from the guerillas" and warned her not to have contact with the guerillas.

---

[8] Again in response to further questioning by the IJ, Galeano added that (1) her father also had received two threatening telephone calls in January or February 2000; (2) she believed that the callers had contacted her father because he supported her work; and (3) as a result of these calls, her father feared for his life and decided to distance himself from the Liberal Party.

[9] Although Galeano initially stated that she received this second call in September 2000, she subsequently stated that she received it in early June, before her first trip to the United States.

Galeano also disclosed for the first time during this hearing that, on June 17, 2000, she entered the United States to clear her mind and "take out the stress [she] had."[10] During this visit, which lasted for five months, Galeano left her daughter with her parents in Colombia, and she stayed with her then future husband. Galeano did not seek asylum during this visit because she (1) was concerned about her daughter's safety; and (2) did not feel as much pressure at that time as she subsequently felt in September 2001, when she filed her asylum application.

Between November 2000, when Galeano returned to Colombia, and March 2001, when she reentered the United States, she received threats that were more "intense" and "acute" than she previously had received. Galeano specifically stated that, in January 2001, she received at her home a third threatening phone call from a member of the paramilitary, during which the caller informed her that she had been placed on a death list.[11] In describing this time period, Galeano initially testified that "I -- we got another call -- there was another call, which -- with the same type of message." However, after the IJ asked Galeano exactly how many

_____

[10] When the IJ asked Galeano why she did not include this June 2000, trip in either her application for relief or her attached narrative, Galeano first replied that "I don't know [it was not included], because I have reported this when the application was made." On further questioning, Galeano stated, "[w]ell, I did not consider that I had to include it in that case. I think I can amend this with my words."

[11] Galeano stated during her testimony that this third phone call was the event that ultimately motivated her to leave Colombia. She also stated that she reported this call to the police, but that she did not have a copy of the police report.

7

threatening phone calls she received, Galeano responded as follows: "[w]ell, exactly that was one call, but was -- that was so horrible."

Galeano testified that she stopped her studies in March 2001, when she left Colombia and entered the United States.[12] She also stated that she was afraid to return to Colombia because she believed that she would be killed. On questioning from the IJ, Galeano stated that she had not tried to move to another place other than Tulua or Cali, and that she did not believe that she could safely relocate to another location in Colombia because "everywhere in Colombia [she would] be in danger, because the paramilitaries move around continuously and they ha[d] others, others [sic] groups and operat[ed] in other zones."

In addition to this testimony, the record contained the U.S. State Department's 2001 Country Report on Human Rights Practices for Colombia ("2001 Country Report"). This document included that Colombia, which is a constitutional, multiparty democracy, generally has a poor human rights record. Internal security is maintained by both the armed forces and the national police. As a result of armed conflict between the government, paramilitary groups, leftist guerillas, and narcotic traffickers, between 3,000 and 3,500 civilians were killed

---

[12] On the other hand, Galeano included in her application for relief that she stopped being a student in Cali, Colombia in 1999. When the IJ asked her to explain this inconsistency, Galeano stated that, in November 1999, she took a break from her studies to give birth to her daughter.

8

during 2001, including combat casualties, political murders, and forced disappearances. The paramilitary umbrella organization, which has an estimated membership of between 8,000 and 11,000 combatants, "exercised increasing influence during the year and fought to extend its presence through violence and intimidation into areas previously under guerilla control while conducting selective killings of civilians whom it alleged collaborated with guerillas." The 2001 Country Report also included that, although the paramilitaries had increasing popular support in 2001 due, in part, to the guerillas' continued human rights violations, the paramilitaries relied less on massacres, and the government and law enforcement officials increased their efforts to combat paramilitary groups and to prosecute persons who financed the paramilitaries.

Furthermore, Galeano submitted a report prepared by United Nations High Commissioner for Refugees in 2002, which was titled "Internal Protection Considerations Regarding Colombian Asylum-Seekers and Refugees" ("UNHCR Report"). The UNHCR Report included that "[t]he Colombian political scene has long been dominated by two rival political parties, the Conservative Party . . . and the Liberal Party . . . and is characterized by organized violence and a weak [s]tate." Paramilitary organizations, which emerged in Colombia in the 1980s, initially to provide protection to large landowners and drug lords, combined in

9

1997, and, since, have used "extreme brutality" toward civilian populations, including killing, torturing, kidnaping, extortion, and threatening civilians suspected of sympathizing with guerillas. The paramilitaries, who were responsible for generating about half of all internal displacement in Colombia in 2002, typically enter a community with a list of suspected guerilla collaborators and conduct summary executions. Although the number of massacres had decreased from 2001, the number of selective assassinations and disappearances in areas under the paramilitaries' control had increased. The UNHCR Report also included that persons at special risk of being persecuted in Colombia by both the paramilitaries and the guerillas include, among other groups, persons with a high public/community profile, including women leaders who work to improve living conditions for their communities.[13]

At the conclusion of the evidentiary hearing, the IJ issued an oral decision, denying the petitioners' application for asylum and withholding of removal, and ordering them removed to Colombia. After summarizing Galeano's allegations of past persecution, the IJ determined that "[t]here [were] many inconsistencies

---

[13] In addition to the 2001 Country Report and the UNHCR Report, Galeano submitted into evidence three newspaper clippings from the local press, which discussed that thousands of families had arrived in Tulua, Buga, and San Pedro because of confrontations in the mountainous zone between the paramilitaries and the guerillas, and that the presence of the paramilitaries in Tulua had caused a general atmosphere of terror.

between [Galeano's] testimony and her written asylum application and also internally in [her] testimony [during the hearing]." In explaining these inconsistencies, the IJ first noted that Galeano had failed to include in either her application for relief, or in her detailed narrative addendum to this application, that she had visited the United States in 2000,[14] before she entered for the second time in March 2001, even though this application specifically instructed her to list all previous trips. Second, the IJ explained that Galeano's testimony, that she had stopped being a student in Cali, Colombia in March 2001, was inconsistent with her statement in her application that she stopped attending classes in 1999. Third, the IJ discussed that Galeano (i) had failed to include in her application the threatening phone call that she testified she received in January 2001; (ii) initially had indicated during her testimony that she had received other threatening calls after that date; and (iii) had stated in her application, instead, that her father had received threatening phone calls.

In addition to identifying these inconsistencies, the IJ discussed that Galeano had failed to produce supporting documentary evidence, including police reports that she claimed she filed in relation to several allegations of past persecution.[15]

---

[14] Although the IJ stated that Galeano's first trip to the United States occurred in June 2001, he presumably meant June 2000.

[15] The IJ, however, did state that the record contained the 2001 Country Report for Colombia, along with explaining that this document advised the IJ on the conditions in Colombia

The IJ explained that, "[g]iven the previously mentioned inconsistencies, corroborating evidence about the incidents becomes more important." The IJ concluded that he could not find that Galeano "ha[d] provided consistent and credible evidence to the [IJ] on which she can support her application."

Alternatively, the IJ determined that, even if the IJ were to consider Galeano's testimony as credible, Galeano had failed to establish that she was eligible for asylum or withholding of removal by showing past persecution or a well-founded fear of future persecution based on a protected factor. In making this determination, the IJ specifically stated:

> All of the main problems that she allegedly suffered were before her trip in June 2000 to this country. She came here, stayed for five months with her present husband, and did not request asylum. Despite the supposed terror of the incidents, she returned to Colombia in November of 2001[,][16] and is then frightened by one phone call, if that phone call actually took place. Her father, who was also threatened and was a member of the Liberal Party, remains in her home in Tulua, Colombia, and there is no evidence that anything further has happened to him or that there have been any further threats . . .. [At] most, she received several phone calls and one physical warning. She was never mistreated or harmed and there has been no showing why she cannot return to Colombia and live there without being harmed for any of the five . . . enumerated grounds.

_____

as of the date of its issuance.

[16] As discussed above, Galeano actually returned to Colombia in November 2000.

Galeano appealed the IJ's decision to the BIA, arguing in her brief that the IJ erred in denying her asylum and withholding of removal because the evidence established that she was persecuted in the past in Colombia by paramilitaries because of her political opinion, and that she had a well-founded fear of future persecution based on her past persecution. As part of this appeal, Galeano moved the court to remand the case to the IJ to consider new evidence that she had attached to the brief, that is, evidence showing that, six days after the evidentiary hearing, Galeano's brother was shot while he was walking on a street in Medellin, Colombia. Galeano also attached in support a document her father had filed with the authorities after this killing, in which he reported this incident, summarized other threats the family had received, and requested protection. The BIA affirmed without opinion the IJ's decision, pursuant to 8 C.F.R. § 1003.1(e)(4), without discussing the new evidence. Galeano then filed this timely petition for review.[17]

**Issue 1:      Adverse Credibility Determination**

Galeano generally argues that, if we conclude that the IJ's comments in his oral decision constituted an adverse credibility determination, the IJ erroneously

---

[17] On February 7, 2005, we sua sponte dismissed this petition for review as untimely, based on our determination that the petition, which was file stamped on January 14, 2005, should have been filed by January 13, 2005. However, we subsequently vacated this dismissal order, explaining that "[c]ounsel for [p]etitioners ha[d] supplied confirmation that the petition was received by the Court on January 13, 2005."

13

reached this determination based on (1) minor and irrelevant discrepancies in the record, (2) the IJ's unreasonable expectation that Galeano provide supporting police reports, and (3) the IJ's failure to consider all of the evidence in the record. Galeano specifically contends that her omission from her application of her June 2000, trip to the United States did not support the adverse credibility determination because (1) this omission was minor, (2) Galeano corrected it when she testified about it during the evidentiary hearing, and (3) she explained that she did not initially include it because she did not realize that such inclusion was required.

Galeano similarly asserts that, any discrepancy between her application and her testimony as to when she stopped being a student was minor, collateral to her claims for relief, and explained by the fact that she first left her studies in 1999, when she gave birth to her child. In addition, Galeano argues that her failure to include in her asylum application her testimony that she, instead of her father, received a threatening phone call in January 2001, and inconsistencies during her testimony on how many calls she received during this time period, in addition to being minor, either were ambiguous omissions, or involved matters for which the IJ should have developed a better record. Finally, Galeano contends that the IJ (1) erroneously relied on the fact that she did not introduce police reports that she claimed she filed as a result of harassing incidents, (2) did not allow her sufficient

14

time to obtain these police reports, and (3) did not consider other supporting evidence in the record.

When a single member of the BIA summarily affirms the IJ's decision without an opinion, such as here, the IJ's decision becomes the final removal order subject to review. See Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1284 n.1 (11th Cir. 2003). To the extent that the IJ's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other hand, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar v. Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (quotation and internal marks omitted).

"We cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below." Id. at 1278. Moreover, "[u]nder the substantial evidence test, we review the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005). Thus, a finding of fact will be reversed "only when the record compels a reversal; the mere fact that the record may support a

contrary conclusion is not enough to justify a reversal of the administrative findings." Id.

A credibility determination also is reviewed under the substantial evidence test; thus, we "may not substitute its judgment for that of the [IJ] with respect to credibility findings." D-Muhumed, 388 F.3d at 818. If credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005). "The weaker an applicant's testimony, however, the greater the need for corroborative evidence." Id. Indications of reliable testimony include consistency on direct examination, consistency with the written application, and the absence of embellishments. See In re B-, 21 I & N Dec. 66, 70 (BIA 1995); see also Dailide v. U.S. Att'y Gen., 387 F.3d 1335, 1343 (11th Cir. 2004) (affirming the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories and other documentary evidence).

"Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). However, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Id. If an applicant produces evidence beyond his own testimony, "it is

16

not sufficient for the IJ to rely solely on an adverse credibility determination in those instances." Id. Furthermore, "the IJ must offer specific, cogent reasons for an adverse credibility finding." Id. (quotation omitted). "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." Id. (quotation omitted).

As a preliminary matter, to the extent Galeano's brief can be construed as raising the claim that the IJ did not make an adverse credibility determination, we recently have clarified that, when an IJ "says not that [the IJ] believes the asylum seeker or [that] [the IJ] disbelieves her . . . the reviewing Court is left in the dark," and that an IJ must make a "clean determination[] of credibility." See Yang, 418 F.3d at 1201 (internal quotations omitted). However, in addition to finding that "[t]here [were] many inconsistencies between [Galeano's] testimony and her written asylum application and also internally in [her] testimony [during the hearing]," the IJ in the instant case explicitly stated that Galeano "ha[d] not provided credible and consistent evidence to the [c]ourt in support of her application." Thus, we conclude that, despite the IJ's offering an alternative explanation for concluding that Galeano was not eligible for relief from removal, the IJ made an adverse credibility determination.

Moreover, the IJ offered "specific, cogent reasons" for his adverse credibility finding that are supported by the record. Although Galeano disclosed during her testimony that she traveled to the United States in June 2000, and that she remained in the United States for five months before returning to Colombia, she failed to either include this fact in her application or her attached narrative when the application specifically instructed her to include all such information, or to explain during her testimony why she previously omitted this fact. Contrary to Galeano's argument that this omission was immaterial, it involved five months during the time period that she alleged the paramilitaries were persecuting her. Moreover, as discussed below, Galeano's failure to apply for asylum and her voluntary return to Colombia in November 2000, was relevant to the issue whether she subjectively had a well-founded fear of persecution. See 8 C.F.R. § 208.13(a), (b) (requiring petitioner seeking asylum to establish either past persecution or a "well-founded fear" of future persecution based on a protected factor).

Similarly, to the extent the IJ focused on the inconsistency relating to when Galeano stopped being a student, the record reflects that Galeano stated in her application that she stopped her studies in 1999, while she testified during the hearing that she stopped being a student in March 2001, when she left Colombia and entered the United States. Although this discrepancy arguably was not

18

sufficiently significant on its own to support an adverse credibility determination, and it was, at least partially, explained by the fact that Galeano temporarily left her studies in 1999 to give birth. Galeano's status as a full-time student in Cali, Colombia, was material to the extent that she also offered evidence that, during this time period, she was an "active member" of the Liberal Party, and that she was a community leader in Tulua, Colombia—a town that was approximately an hour-and-a-half drive from Cali, Colombia.

Finally, although Galeano testified that she primarily decided to leave Colombia due to a threatening phone call she received in January 2001, during which the caller informed her that she had been placed on a death list, Galeano offered inconsistent, or at least confusing, testimony on how many threatening phone calls she received after she returned to Colombia in November 2000. Galeano also only included in her application that her father received threatening phone calls during this time period. Thus, Galeano has failed to show that the IJ's credibility decision "was not supported by 'specific, cogent reasons[,]' or was not based on substantial evidence." See Forgue, 401 F.3d at 1287.

To the extent Galeano also is arguing that the IJ erred in requiring her to produce police reports that she claimed she filed after some of the alleged incidents, as discussed above, if credible, the alien's testimony may be sufficient to

19

sustain the burden of proof without corroboration.  See id.  However, the IJ only noted that Galeano had failed to provide corroborating police reports after the IJ explained why Galeano's testimony on the incidents at issue in these reports was not credible.  In addition, despite Galeano's argument  that the court should have granted her a continuance to produce this evidence, Galeano failed to request such a continuance, and Galeano has failed to explain why she could not have obtained this evidence prior to the evidentiary hearing, which was conducted in October 2003, more than two years after she arrived in the United States in March 2001.

Moreover, although, as discussed above, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant," see id., the IJ's decision does not reflect that it relied solely on its adverse credibility determination.  Indeed, the IJ explicitly stated in his decision that the record contained the 2001 Country Report for Colombia, along with explaining that this document advised the IJ on the conditions in Colombia as of the date of its issuance.  Although the IJ did not  discuss either the UNHCR Report or the local newspaper clippings Galeano submitted, these additional documents contained the same relevant information on the paramilitaries' activities in Colombia as outlined in the 2001 Country Report, and

20

Galeano has not cited to evidence in these documents that compelled the IJ to reach a different finding.

In addition, to the extent Galeano submitted into evidence copies of (1) her identification card with the Liberal Party; and (2) a letter by the Liberal Party's President, which included that Galeano was an asset to the party, and that her departure was related to "security reasons due to the risk she ha[d] found herself lately," along with a certification from a Tulua municipal agent, which confirmed her role as a leader in the community and included that her father had stated that she had left the country because she had received a death threat, the fact that evidence in the record also may support a conclusion contrary to the administrative findings is not enough to justify a reversal. See Adefemi, 386 F.3d at 1027. Thus, the IJ's reasons for his adverse credibility determination are supported by substantial evidence, and nothing in the record compels us to substitute our judgment for that of the IJ regarding credibility. See id.

**Issue 2:** **Statutory eligibility for asylum or withholding of removal**

Galeano also argues that the IJ erred in alternatively concluding that she failed to establish statutory eligibility for asylum or withholding of removal. Galeano generally asserts that the IJ's decision reflects that the IJ made incomplete findings of fact and failed to take into consideration all of the evidence in the

21

record. Galeano contends that she showed past persecution based on her political affiliation by offering evidence that (1) she received death threats, (2) her father received calls regarding her safety, (3) she received a warning after her vehicle was intercepted, and (4) paramilitaries trespassed on her family's farm and inquired about her political activities.

Galeano alternatively argues that she showed a well-founded subjective and objective fear of future persecution by offering credible testimony that she feared for her life, and by submitting evidence confirming the activities of the paramilitaries in the 2001 Country Report and the UNHCR Report. Galeano contends that the continued presence of her family members in Colombia did not contradict her claim that she has a well-founded fear of returning to Colombia because (1) the government failed to show that these family members were similarly situated, (2) the IJ failed to develop the record as to the threats her father received regarding her safety, and (3) new evidence she submitted to the BIA reflected that her family continued to be threatened. Moreover, Galeano argues for the first time in reply that, to the extent we may not engage in fact finding relating to new evidence that she submitted on appeal to the BIA, we should remand the case to allow the IJ to consider in the first instance all of the relevant evidence and to avoid a manifest injustice.

As a preliminary matter, to the extent Galeano's reply brief can be construed as arguing that the BIA erred in not remanding the case to the IJ to consider evidence showing that her brother had been killed in Colombia following the IJ's issuance of its decision, Galeano included in her statement of the facts that she submitted this evidence to the BIA, and she discussed in her argument section that the IJ's decision that she did not have a well-founded fear of future persecution was undercut by her brother's subsequent killing. Galeano, however, did not argue in her initial brief that the BIA erred either in not remanding the case to the IJ to consider this new evidence, or in not discussing this evidence in its order affirming the IJ's decision. Galeano, therefore, has abandoned this argument by failing to raise it in her initial brief. See Sepulveda, 401 F.3d at 1228 n.2.[18] Moreover, as discussed above, because the record does not reflect that either the IJ or the BIA considered this new evidence, we may not consider it in the first instance. See Al Najjar, 257 F.3d at 1278 (holding that we "cannot engage in fact-finding on appeal, nor may we weigh evidence that was not previously considered below"); see also Forgue, 401 F.3d at 1286 (explaining that we "cannot find, or consider, facts not raised in the administrative forum").

---

[18] Even if Galeano had not abandoned this argument, it is without merit. Although the BIA has the discretion to grant a motion to reopen if there is new evidence that is material and was not available at the removal hear, see 8 C.F.R. § 1003.2(c)(1), and although evidence relating to her brother's killing was new, Galeano did not establish that this killing was related to her claims in her application for relief from removal, and, thus, that it was material.

23

Also as discussed above, the IJ's factual determinations are reviewed under the substantial evidence test, and we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." See Al Najjar, 257 F.3d at 1283-84. An alien who arrives in, or is present in, the United States may apply for asylum. INA § 208(a)(1), 8 U.S.C. § 1158(a)(1). The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets the INA's definition of a "refugee." INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[19] A "refugee" is defined as

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). "The asylum applicant carries the burden of proving statutory 'refugee' status." D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and credible evidence, demonstrate (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause

---

[19] Pursuant to the REAL ID Act of 2005, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003. See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

24

future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287. If the petitioner demonstrates past persecution, there is a rebuttable presumption that he has a well-founded fear of future persecution. 8 C.F.R § 208.13(b)(1). If he cannot show past persecution, then the petitioner must demonstrate a well-founded fear of future persecution that is both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289. The subjective component can be proved "by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

An alien seeking withholding of removal under the INA must show that his "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A). An alien seeking withholding of removal, however, must demonstrate that he "more-likely-than-not would be persecuted or tortured upon his return to the country in question," Mendoza, 327 F.3d at 1287. An alien also cannot demonstrate that he more-likely-than-not would be persecuted on a protected ground if the IJ finds that the alien could avoid a future threat by relocating to another part of his country. Id. Thus, we have

determined that this burden of proof, although similar to the burden for asylum relief, is "more stringent." Sepulveda, 401 F.3d at 1232.

The statutes governing asylum and withholding of removal protect not only against persecution by government forces, but also against persecution by non-governmental groups that the government cannot control. Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437 (11th Cir. 2004). However, the applicant must present "specific, detailed facts showing a good reason to fear that [s]he will be singled out for persecution on account of such an opinion." Al Najjar, 257 F.3d at 1287. Furthermore, although the INA does not define persecution, we have explained that "mere harassment does not amount to persecution," and that persecution it as "an extreme concept requiring more than a few isolated incidents of verbal harassment or intimidation." Sepulveda, 401 F.3d at 1231 (internal quotations and marks omitted).

Here, even accepting as true Galeano's testimony, she did not establish that she suffered past persecution based on either her political opinion, or her membership in the Liberal Party. Galeano testified that (1) in June 1999, either guerillas or paramilitaries approached her Liberal Party group and threatened them; (2) in August 1999, paramilitaries trespassed on her family farm and asked about her "political affiliation"; (3) in 2000 and 2001, persons who identified themselves as paramilitaries called her at her family home on three different occasions and

threatened her; and (4) in April 2000, a man in a vehicle pulled up to her while she was walking down the road, identified himself as a paramilitary, and threatened her. However, even assuming a nexus existed between Galeano's political opinion and the alleged incidents, none of these incidents rose to the level of persecution necessary to satisfy the showing for asylum or withholding of removal. See Sepulveda, 401 F.3d at 1231 (holding that "menacing telephone calls and threats" did not rise to the level of past persecution for asylum).

Galeano also failed to demonstrate, in the alternative, a future threat to her life or freedom on a protected ground in Colombia, or that she could not avoid a threat by relocating to a different part of Colombia. As discussed above, the IJ finding as not credible Galeano's testimony that she received a death threat in January 2001, was supported by substantial evidence in the record. Despite Galeano's testimony that she was afraid to return to Colombia because she believed that she would be killed, and that she did not seek asylum during her first trip to the United States because she was concerned about the safety of her minor daughter, who was still living in Colombia, she voluntarily returned to Colombia only several months before leaving it again, and she eventually sought asylum, despite that her daughter still is living in Colombia. In addition, Galeano's claim that a future threat exists is belied, at least in part, by the fact that the record does not contain evidence showing that other members of her remaining family in

27

Colombia—including her father, who is also a member of the Liberal Party—have been persecuted based on a protected factor. Cf. Tawm v. Ashcroft, 363 F.3d 740, 743 (8th Cir. 2004) (concluding as persuasive authority that an alien did not establish a well-founded fear of future persecution where, among other things, the alien's family continued to live in Lebanon without incident).

Finally, to the extent Galeano relies on the 2001 Country Report and the UNHC Report in asserting that she had a well-founded fear of returning to Colombia, both of these documents reflected that the paramilitaries had a wide membership in Colombia and exercised increasing influence in 2001. However, whether or not Galeano could relocate to another area where the presence of paramilitaries was non-existent or minimal, she failed to demonstrate that she would be singled out for persecution on account of a protected ground. See Sepulveda, 401 F.3d at 1232-33 & n.7 (affirming denial of asylum and withholding of removal, despite that Country Report in the record reflected that the petitioner could not relocate to an area in Colombia where the presence of guerillas would be non-existent or minimal). Thus, the IJ's determination that the petitioners failed to establish statutory eligibility for asylum or withholding of removal is supported by substantial evidence, and the record does not compel a contrary result. See Al Najjar, 257 F.3d at 1283-84.

Accordingly, we conclude that substantial evidence supported both the IJ's adverse credibility determination and the IJ's alternative determination that the petitioners failed to establish statutory eligibility for either asylum or withholding of removal. We, therefore, deny their petition for review.

**PETITION DENIED.**