[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**July 29, 2005**
**THOMAS  K. KAHN**
**CLERK**

_____

No. 03-16068

_____

Agency No. A74-855-742

FENG CHAI YANG,

Petitioner,

versus

UNITED STATES ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(July 29, 2005)**

Before EDMONDSON, Chief Judge, TJOFLAT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Feng Chai Yang ("Yang"), a native of the Fujian province of China, seeks asylum in this country on the basis of her resisting China's one-child policy. Yang now petitions us to review the Board of Immigration Appeals' ("BIA's") decision affirming the Immigration Judge's ("IJ's") order denying Yang's application for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). We first must determine whether the IJ made an adverse credibility finding against Yang. If we find that the IJ did not make such a finding, we will address whether Yang's acts of resistance to China's family policies make her eligible for asylum in the United States.

## I. FACTS AND PROCEDURAL HISTORY

Yang was born on July 3, 1970 in Linjian (phonetic sp.), Fuzhou City, in China. She then moved to the Fujian province where she married Jian Guo Zhang ("Zhang") in 1990. Following the birth of her daughter in May 1991, she claims that the Chinese government forced her to have an intrauterine device ("IUD") inserted. Because the IUD caused her to have discomfort and problems with her menstrual cycle, she engaged a private doctor to remove the IUD. Shortly thereafter, she discovered that she had become pregnant again. In March of 1992,

2

she decided to go into hiding in Guandxi so that she could conceal the pregnancy from the Chinese Birth-Control Officials ("Officials"). When she failed to go to governmentally imposed check-ups, the Officials harassed her family. Her husband left China in October of 1992. Yang gave birth on November 7, 1992 to a son and was forced to pay a fine for violating China's birth-control policy.

In March of 1996, Yang claims that she and many other women were unwillingly and forcibly subjected to "experimental medical sterilization." She maintains that five or six people, including members of the police and officers from the family planning office, pulled her out of her home and brought her into a hospital where she was forced onto a hospital bed as she cried and shouted for them to let her go. She claims that they were about to perform a sterilization operation when she stated that she was allergic to anesthesia and, therefore, could not undergo the operation. In response, the doctor told her that she would undergo an "injection sterilization" which would not require anesthesia.

Apparently, because other women who had undergone similar "sterilizations" were still getting pregnant, the Officials returned to her home in 1997 and arrested her for a second "sterilization." She claims that she again told them about her allergy to anesthetics, and when they tested it by giving her only a small amount she broke out in burning bumps all over her body. She was forced to

3

return for another IUD insertion a month later. Again, she claims that the IUD caused her discomfort.

Yang engaged the aid of a smuggler to help her escape China. On September 18, 1998, the smuggler assisted her in entering the United States through Canada. She then went to New York to join her husband, who was already residing there illegally. After Yang arrived in the United States, an American gynecologist removed her IUD and discovered that she suffered from an ovarian cyst. Once the IUD was removed, Yang became pregnant with a third child and gave birth in the United States.

The former INS[1] served a Notice to Appear on Yang, charging her with being removable under section 212(a)(6)(A)(i) of the INA, 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without having been admitted. Yang sought asylum, asserting that she had been persecuted for resisting China's family-planning policies.

After an evidentiary hearing, the IJ concluded that Yang had failed to sustain her burden of proof required for asylum relief. Thus, the IJ denied Yang's application for asylum and ordered that she be removed to China. The IJ also denied her claim for withholding of removal under the CAT noting that the burden

---

[1]Under the Homeland Security Act of 2002, the INS was abolished and its functions were transferred to the newly-created Department of Homeland Security (DHS).

of proof is higher under the Torture Convention than it is under the INA. Yang

filed a timely Notice of Appeal with the BIA. The BIA affirmed the IJ's decision

without opinion. Yang now appeals.

## II. DISCUSSION

### *A. Yang's Credibility*

We first turn to the question of whether the IJ made an adverse credibility

determination and, if so, whether substantial evidence supports that determination.

Because the BIA affirmed without opinion the IJ's decision pursuant to 8 C.F.R. §

1003.1(e)(4), the IJ's decision is the final agency determination, and thus, the one

before us on appeal. *Mendoza v. United States Attorney Gen.*, 327 F.3d 1283,

1288-89 (11th Cir. 2003).

It is the duty of the fact finder to determine credibility, and we may not

substitute our judgment for that of the IJ with respect to credibility findings.

*Vasquez-Mondragon v. INS*, 560 F.2d 1225, 1226 (5th Cir. 1977).[2] Thus, the IJ's

administrative findings of fact are conclusive unless a reasonable factfinder would

be compelled to conclude to the contrary. *Fahim v. United State Attorney Gen.*,

278 F.3d 1216, 1218 (11th Cir. 2002). Uncorroborated but credible testimony may

---

[2]The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

be sufficient to sustain the burden of proof for demonstrating eligibility for asylum. 8 C.F.R. 208.13(a), 208.16(b). The weaker an applicant's testimony, however, the greater the need for corroborative evidence. *Matter of Y-B-*, 21 I&N Dec. 1136, 1139 (BIA 1998).

The IJ did not expressly state whether she found Yang's testimony to be credible or not. We agree with our sister Courts that when an IJ "says not that [s]he believes the asylum seeker or [that] [s]he disbelieves her . . . the reviewing Court is left in the dark." *See Li Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005) *citing Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004); *Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 660-61 (9th Cir. 2003); *Diallo v. INS*, 232 F.3d 279, 287-88 (2d Cir. 2000). Though the IJ made a reference to Yang's claims as a "ridiculous fabrication" and stated that her testimony was "extremely inconsistent and [made] absolutely no sense whatsoever," we are not persuaded that this was an explicit finding that Yang's testimony was not credible. IJ's must make "clean determinations of credibility." *Id.* Moreover, the thrust of the IJ's analysis focuses on the insufficiency of Yang's evidence, rather than on any credibility issues. Thus, for purposes of our review, we will assume that any credibility determinations by the IJ were *not* dispositive of the appeal.

*B. Yang's Asylum Eligibility*

We now turn to the merits of Yang's claim. Specifically, we will address whether substantial evidence supports the IJ's finding that Yang failed to demonstrate eligibility for asylum under the INA. To the extent that the IJ's decision was based upon a legal determination, we review the IJ's decision *de novo*. *Mohammed v. Ashcroft*, 261 F.3d 1244, 1247-48 (11th Cir. 2001). We review the IJ's factual determinations under the substantial evidence standard, and "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1283-84 (11th Cir. 2001) (citation omitted) (transitional-rules cases); *see also* INA § 242(b)(4)(B), 8 U.S.C. § 1252(b)(4)(B) ("administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary"). To reverse the IJ's decision, we must conclude that the record not only supports such a conclusion, "but *compels* it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1, 112 S.Ct. 812, 815 n.1, 117 L.Ed.2d 38 (1992) (emphasis in original).

An alien who is present in the United States may apply for asylum. Section 208(a) of the Immigration and Nationality Act ("INA") gives the Attorney General discretion to grant political asylum to any alien determined to be a "refugee" within the meaning of the INA. 8 U.S.C. § 1101(a)(42)(A); 8 U.S.C. § 1158(b)(1).

A refugee is defined as one who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

To establish asylum eligibility, the alien must, with specific and credible evidence, establish past persecution on account of a statutorily listed factor, or a "well-founded fear" that the statutorily listed factor will cause such future persecution. 8 C.F.R. §§ 208.13(a) and (b); *Al Najjar*, 257 F.3d at 1287. An applicant must demonstrate "that his or her fear of persecution is subjectively genuine and objectively reasonable." *Id.* at 1289. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution." *Id.* "In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a 'good reason to fear future persecution.'" *Id.*

In 1996, Congress amended the definition of the term "refugee" to include "[a] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program." INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B). *See also In re* X-P-T-, 21 I. & N. Dec.

8

634, 638, 1996 WL 727127 (BIA 1996). The definition also includes "a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance . . ." INA § 101(a)(42)(B).

*1. Persecution Based on Undergoing a Sterilization Procedure or Well-Founded Fear of Becoming Sterilized*

We look first to whether Yang was persecuted or has a well-founded fear of persecution. Because we cannot conclude that the record compels a contrary finding than that made by the IJ, we credit the IJ's finding that Yang did not demonstrate past persecution or a well-founded fear of future persecution on account of her political opinion. Specifically, Yang failed to establish that the Officials' alleged attempts to sterilize her made her eligible for asylum. The IJ correctly found that Yang failed to provide sufficient evidence indicating that: (1) any injection she received was intended to sterilize her instead of a hormone injection used as a birth-control measure;[3] and (2) she was allergic to anesthesia, or

_____

[3]Though we do note that Yang submitted official documentation from the Chinese government indicating that she underwent a "sterilization procedure," this document has not been authenticated, and thus we cannot depend on its veracity. Furthermore, Yang claimed in her testimony that she was not sure what the full effect of the injection would be, but that the Officials told her that "they have injection for [her] in order for [her] to stop to have the baby." Thus, because she did get pregnant directly after the IUD was removed, the evidence shows that the injection was likely a temporary hormone injection as opposed to a permanent sterilization procedure.

9

that the Officials's attempts to sterilize her were thwarted by her reaction to the anesthesia.[4] Moreover, the State Department's 2001 Country Reports on Human Rights Practices and its 1998 Profile of Asylum Claims and Country Conditions for China indicate that Yang's home province, the Fujian province, is known for its lax enforcement of China's family-planning policies.

*2. Persecution for Failure to Undergo a Procedure*

Because we conclude that the record does not compel us to find that Yang was forced to undergo a sterilization procedure, we next must look to whether she was "persecuted for failure or refusal to undergo such a procedure." INA § 101(a)(42)(B), 8 U.S.C. § 1101(a)(42)(B). Yang first asserts that the fine that she was forced to pay when she gave birth to her second child amounted to persecution for failure to follow China's official policy concerning child birth. The evidence indicates, however, that the fines were paid by Yang or her family within three days of assessment, indicating that she did not dispute the fine. Furthermore, a single fine is not akin to a sterilization procedure or forced abortion.

*3. Other Resistance to a Coercive Population Control Procedure*

---

[4]Yang claimed that she was allergic to all anesthetics including pain relievers such as Aspirin and Tylenol. In the medical reports, which she submitted from the birth of her third child in America, the doctor's notes indicate that she was administered Tylenol. Thus, we agree with the IJ that she failed to provide sufficient evidence of her allergy.

Although we did not find substantial evidence in the record that would compel us to conclude that Yang was forcibly sterilized, we do believe, and the IJ did not find to the contrary, that Yang was credible in her claim that she was forced to undergo an atrocious injection procedure to which she fought back by kicking and screaming. This claim could constitute "other resistance to a coercive population control program." 8 U.S.C. § 1101(a)(42)(B). There is very little case law analyzing the "other resistance" clause in the asylum statute. Additionally, a review of the legislative history behind the 1996 Amendment does not reveal any clear intent from Congress on the scope of the "other resistance clause."[5]

The Ninth Circuit is the only federal court to undergo an in-depth analysis of the "other resistance" clause in the asylum statute. *See Li v. Ashcroft*, 356 F.3d 1153, 1160 (9th Cir. 2004) (en banc).[6] The *Li* court held that the applicant, Li, was

---

[5]When Congress amended the definition of "refugee" and added the "other resistance" clause to the statute, it had before it evidence from subcommittee hearings held in May, June, and July of 1995 on the subject of coercive population control in the People's Republic of China. *See Zhao v. United States Dept. of Justice*, 265 F.3d 83, 92 (2nd Cir. 2001), *citing Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations & Human Rights of the House Comm. on Int'l Relations* (*Hearings*), 104th Cong. (1995). The Hearings do not reflect the intent behind the "other resistance clause." Instead, the record is replete with general statements discussing that China "has repeatedly cracked down on those who resist forced sterilization [and that it] treats them as political and ideological criminals, and as enemies of the state." *Id.* The hearings also focused on China's infliction of "harsh punishment on refugees who are returned, such as beatings and being sent to forced labor camps, and being sentenced to prison." *Id.*

[6]Recent decisions have analyzed whether this clause applies to the spouses of people who have undergone forced sterilizations or abortions. In a Fifth Circuit decision, *Zhang v. Ashcroft*, 395 F.3d 531(5th Cir. 2004), the petitioner's "live-in" girlfriend was a Chinese national living in

11

persecuted for "other resistance" to a population control program within the meaning of the asylum statute, when she "vocally resisted the marriage-age restriction . . . [and] the one-child policy," in China. *Id.* Li announced to Officials that she opposed the government's birth-control policy. *Id.* at 1158.[7] Two days later, Officials, "forcibly took Li to a birth control center where she was put on a bench and held down by two nurses . . . Li's uterus, vagina, and cervix were probed while she resisted physically by kicking and screaming in fear." *Id.* The Officials then told her "that at any time in the future, she could be subjected to the same sort of test, and that if she were pregnant, she would be subject to forced abortion and her boyfriend sterilized." *Id.* The court found that her verbal resistance to the policy and her physical resistance in the ensuing "rape-like" event, *Id.* at 1158 n.4, constituted "other resistance to a coercive population control program." *Id.* at 1160.

In the present case, Yang's forced injection experience bears similarities to the persecution that occurred in the *Li* case. First, like the physical force used

China who was fined and forced to have an abortion pursuant to China's population control program. The Court held that the petitioner "exhibited no legally cognizable 'resistance' to China's population control program" because the court held that "merely impregnating one's girlfriend is not alone an act of 'resistance.'" *Id.* The BIA only extends refugee protection to an applicant whose *spouse* suffered forced sterilization or abortion. *See In Re C-Y-Z*, 21 I. & N. Dec. 915, 918 (BIA 1997).

[7]Specifically, Li told Officials that she would "have many babies." *Li v. Ashcroft*, 356 F.3d at 1160.

12

against Li, Yang's testimony indicates that she was forcibly taken to the hospital by five or six Officials. Next, like Li's verbal and physical resistance, which triggered her persecution by Chinese birth-control officials, Yang's testimony also indicates that she verbally and physically resisted as they forced her out of her home and onto the hospital bed.

Furthermore, Yang's two forced IUD procedures by the Chinese Officials could also be considered "other resistance." Recently, the Fourth Circuit, in denying relief to the petitioner in *Li v. Gonzales*, 405 F.3d 171, 179 (4th Cir. 2005), explained that if the petitioner's arguments on appeal "were not so narrowly limited to [a] single act of insertion, [the court] might well be prepared to hold that the compulsory insertion and required usage of an IUD constitutes "persecution" within the meaning of 8 U.S.C. § 1101(a)(42)."[8] Additionally, the Third Circuit recognized in *Fang v. Ashcroft*, 114 Fed. Appx. 486 (3rd Cir. 2004), that the "[BIA] and the Circuit Courts have not specifically addressed whether a woman who unwillingly acquiesced to obtaining an IUD 'has been persecuted' under the

_____

[8]Instead, because the petitioner's argument was narrow and the petitioner (1) "voluntarily chose to leave the IUD in place during her [four year] residence in the United States;" and (2) did not allege "force, physical abuse, or other equivalent circumstances, and thus [did] not challenge the manner or means of the insertion," the Court concluded that "the BIA did not abuse its discretion when it determined that [the petitioner] was not persecuted for resistance to China's coercive population control program." 405 F.3d at 179-80. Yang's case is distinguishable because she twice had her IUD removed and alleged physical and verbal resistance to the Officials's attempts to prevent her pregnancies.

[other resistance] clause." Therefore, the *Fang* court remanded the case to the BIA for further proceedings. Similarly, in *Lin v. Ashcroft*, 385 F.3d 748, 757 (7th Cir. 2004), the court noted that the "IJ did not determine whether Lin's three involuntary IUD insertions and mandatory checkups could constitute persecution as a 'coercive population control program' under the amended statutory definition." Most recently, the Seventh Circuit in *Zheng v. Gonzales*, 409 F.3d 804, 806 (7th Cir. 2005), noted that the BIA "assumed that the involuntary insertion of IUDs constitutes persecution pursuant to a 'coercive population control program' for purposes of § 1101(a)(42)(B)." Because the "BIA assumed" that "persecution under the expanded definition of refugee can be established on the basis of forcible IUD insertions alone" rather than definitively deciding the issue, the Court remanded the case for the BIA to decide. *Id.* at 811-12.

Moreover, in *Lin*, the Court mentioned that having a government imposed IUD illegally *removed* could constitute a type of "other resistance to a coercive population control program." *Lin*, 385 F.3d at 757. The *Lin* court pointed out that the IJ left open the question whether the petitioner's efforts to have IUDs, which were forced upon her by Chinese Officials, removed by a private doctor, is the type of 'resistance' that Congress sought to protect under the asylum statute. *Id.* The *Lin* court also remanded these issues to the BIA. *Id.*

14

We agree with the Seventh Circuit that removing an IUD against China's official policy could be considered "other resistance" to a coercive population control program.[9] We also note that the removal of IUDs from women of childbearing age without the permission of family planning authorities is punishable as a crime in China. *See, e.g.*, Xiaorong Li, *License to Coerce: Violence Against Women, State Responsibility, and Legal Failures in China's Family-Planning Program*, 8 Yale J.L. & Fem. 145, 171-72 (1996). Thus, like the Third and Seventh Circuits, we will defer to the BIA's decision on these issues concerning the "other resistance to a coercive population control program" clause in the 1996 Congressional Amendment. 8 U.S.C. § 1101(a)(42)(B).

## III. CONCLUSION

We AFFIRM the BIA's decision affirming the IJ's finding that Yang did not undergo a forced a sterilization and, therefore, is not eligible for asylum on the ground that she was persecuted or had a well-founded fear of future persecution.

We REMAND the question of whether Yang's acts of (1) verbally and physically resisting an injection procedure, (2) having two IUDs inserted against

---

[9]Again, the legislative history on this clause is not forthcoming with evidence of Congressional intent. Though some testimony presented to the House Subcommittee discussed that there is an "upward trend in IUD insertions" in China, *see Hearings*, 104th Cong. (1995) (statement of John S. Aird, Former Senior Research Specialist on China at the U.S. Bureau of the Census), IUD insertion or removal was not prevalent in the evidence presented to Congress.

her will, or (3) privately taking out two governmentally imposed IUDs, could be construed as "other resistance to China's birth control policies."