[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 3, 2006
THOMAS K. KAHN
CLERK

No. 05-13360
Non-Argument Calendar
_____

BIA Nos. A79-447-717 & A79-447-718

DEMIRALI MUSAKA,
YIFET MUSAKA,
ERIKETA MUSAKA,
ERION MUSAKA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(January 3, 2006)

Before TJOFLAT, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Petitioners Demirali, Yifit, Eriketa, and Erion Musaka, through counsel, petition this Court for review of the Board of Immigration Appeals's ("BIA's") order affirming the immigration judge's ("IJ's") denial of their application for asylum under the Immigration and Nationality Act ("INA").[1] The petitioners argue that the BIA's determination that they failed to establish that their allegations of past persecution were causally related to the lead petitioner's political opinion was not supported by substantial evidence.[2] For the reasons set forth more fully below, we deny their petition.

On May 1, 2002, the petitioners, natives and citizens of Albania, entered the United States without proper authorization and were detained. The Immigration and Naturalization Service ("INS")[3] served the petitioners with notices to appear ("NTAs"), charging them with removability, pursuant to INA § 212(a)(7)(A)(i)(I),

---

[1] Because the petitioners have not challenged on appeal the denial of their claims for withholding of removal under the INA or the United Nations Convention on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), they have abandoned our review of these claims. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (holding that, "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned").

[2] Congress recently directed that all petitions for review will be governed under the permanent provisions of the Illegal Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA"). See Huang v. U.S. Att'y Gen., No. 04-15455, slip op. at 382 n.3 (11th Cir. Sept. 8, 2005) (citing REAL ID Act of 2005, Pub.L. 109-13, 119 Stat 231 (May 11, 2005)).

[3] On November 25, 2002, President Bush signed into law the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135. This legislation created a new Department of Homeland Security, abolished the INS, and transferred its functions to the new department. Because this case was initiated while the INS still was in existence, this opinion refers to the agency as the INS.

2

8 U.S.C. § 1182(a)(7)(A)(i)(I).  The petitioners appeared before an IJ and conceded removability.   After the petitioners declined to designate a country of removal, the IJ designated Albania.

In December 2002, Demirali Musaka filed an application for asylum under the INA.[4]  Musaka asserted in this application that he was seeking asylum based upon political opinion and membership in a social group, that is, his membership in the Democratic Party ("DP").  In explaining his past persecution, Musaka asserted that, on March 16, 2002, two masked men armed with machine guns threatened that, if he did not pay them $100,000 in U.S. dollars, they would (1) take his daughter and wife and force them into prostitution, and (2) kill his son.  Musaka also asserted that these masked men told him that they knew that (1) members of his family were living abroad, (2) he had supported the DP, and (3) in 2001, he had shaken hands with Sali Berisha.[5]

In December 2003, at an evidentiary hearing on Musaka's application for asylum, Musaka, who was 50 years' old at the time of the hearing, offered the following testimony.  At age 13, after he attended elementary school for eight years, the socialist government sent Musaka to work in a labor camp.  Musaka

---

[4]  As the lead petitioner, Demirali included in his application for asylum his wife, Yfit Musaka, and his children, Eriketa and Erion Musaka.

[5]  Musaka explained during an evidentiary hearing on his application for asylum that Sali Berisha was the DP's national political candidate in 2001.

continued working in this camp until 1991, when Albania's socialist system was removed and democratic reforms were implemented. As part of these reforms, Musaka received some of the properties that his father and grandfather previously had possessed, which he began farming.

In 1991, Musaka also became active with the DP in Voskop Village, Albania, where he lived. Musaka specifically served the DP during elections in March 1992, October 1996, and June 1998, as a "member of [the] election commission." Although the DP was in control in Albania when Musaka joined it, the socialist party became the majority political party in 1995. Musaka testified that he remained a member of the DP after 1995. However, other than his serving as a member of the election commission in 1998, the only political activity he identified participating in after 1995 was his attendance at a meeting in June 2001, in Bascaba, Albania, at which the media, police, and 1,500 people were present, and Musaka and 20 other DP members met with Sali Berisha.

Musaka further testified that, in March 2002, two masked men armed with machine guns approached him while he was farming and demanded that he pay them $100,000, in exchange for them not forcing his wife and daughter to "work like prostitutes."[6] These men told Musaka that they knew that he had family living

___

[6] On further questioning by the IJ, Musaka conceded that, (1) prior to 2002, he did not have any encounters with criminals; and (2) he never suffered physical harm.

abroad, and that they, therefore, believed that Musaka had money to give them. Musaka also believed that he had been targeted for this extortion because he was one of the more active DP members, and because he did not have any protection.[7] Musaka explained that, although the men did not refer to his political affiliation, "what they did to me let me know that was one of the reasons." Musaka did not report this threat to the police because he believed that they were part of the socialist system. He also did not report the threat to his family because he did not want them to be afraid.

Approximately two weeks later, another armed masked man approached him as he was leaving his farm.[8] The masked man told Musaka that, if he did not pay him $100,000 within two days, the masked man was going to (1) take Musaka's daughter and wife, and (2) kill Musaka's son. Musaka also did not report this second threat to the police. Instead, Musaka and his family left Voskop Village that night and went to stay with his wife's parents in Dominet, Albania,

---

[7] When asked to elaborate further on why he believed that the masked men had targeted him and why he had left the country, Musaka stated that "they knew I was very active as a member of the [DP] and I hated socialist system, or communist system, and I hated socialist party."

[8] In contrast, Musaka stated during his credible-fear interview that only one man approached him during the first extortion attempt, and that the second attempt occurred four days later. Musaka's wife testified during her credible-fear interview that two men approached Musaka, but that they came to their home, instead of approaching Musaka while he was farming. On describing these extortions, Musaka's daughter commented that she believed the armed men picked her family because they knew that the family had relatives in the United States, and the men thought it would be easy to get money from the family.

which was approximately a two-hour drive from Voskop Village. Fearful that the persons who had threatened Musaka would find them in Dominet, his family left Dominet after four days and went to stay with a cousin in Balsania, Albania for three to four additional days. On April 7, 2004, Musaka and his family left Albania and went to Greece for three to four days. They then traveled to Spain or Portugal, before entering the United States without authority.

Musaka's daughter, Eriketa Musaka, who was 22 years' old at the time of the hearing, also testified, stating that she and her family had come to the United States because they had been threatened, and that, based on these threats, she believed that she and her mother were in danger of being sent to Italy and being forced into prostitution. She also believed that the threats were based on her father's membership in the DP because, since 1991, her father had served the DP "with all of his heart." Eriketa, however, conceded that (1) her father had told her that he was not sure that he knew the men who had threatened them, (2) he only thought they were socialists, and (3) the masked men thought that her father had money because he had relatives living abroad. Eriketa also stated that she was never harassed or detained.

The government submitted for the record the U.S. State Department's 2001 Country Report on Human Rights Practices for Albania ("2001 Country Report"). This document stated that Albania is "a republic with a multiparty parliament, a

Prime Minister, and a President, elected by Parliament," and that the Socialist Party won the majority of parliamentary seats during the 2001 general elections. In 2001, "[t]he [g]overnment's human rights record was poor in many areas; however, there were some improvements." "Trafficking in persons, particularly of women and children, remained a serious problem," and "[t]he police were often directly or indirectly involved." Albania "continued to experience high levels of violent crime, although statistics indicated a decrease in the number of violent incidents from the previous year." Moreover, although the DP credibly reported some incidents of police harassment of its members for political reasons, there were no confirmed cases of political killing or disappearances by the government or its agents, and the killings that occurred throughout the country usually were "the result of individual or clan vigilante actions connected to traditional 'blood feuds' or criminal gang conflicts."

The petitioners submitted for the record copies of (1) Musaka's membership cards for, among other associations, the DP; (2) his Original Certificate from the Anti-Communist Association "20 Shkurti 1991," dated November 15, 2000; (3) his Original "Characteristic" from the DP, dated May 27, 2003; (4) his Original Certificate from the Association of the Ex-Political Persecuted Persons of Albania, dated May 29, 2003; (4) birth certificates for Musaka's son and wife; (5) multiple news articles about country conditions in Albania; and (6) the 2002 Country

7

Report for Albania.  The 2002 Country Report included, among other things, that (1) Albania's human rights record remained poor in many areas; (2) the DP credibly reported some instances of police harassment of its members; and (3) police officers often were involved with trafficking of persons, especially women and children.  This report, however, similar to the 2001 Country Report, stated that (1) there were no confirmed cases of political killings or disappearances by the government or its agents, (2) many killings that had occurred throughout the country were the result of traditional "blood feuds" or criminal gang conflicts, and (3) there were some improvements in its human rights record.

At the conclusion of this hearing, the IJ issued an oral decision, denying the application for asylum and ordering the petitioners removed to Albania.  The IJ determined that Musaka had failed to establish either past persecution, or a well-founded fear of persecution in Albania, on account of a protected factor.  Instead, the IJ found that the petitioners had left Albania "for economic reasons and due to the ongoing political turmoil in Albania as well as the ongoing criminal violence in that country."  The IJ also explained that Musaka had (1) "failed to provide testimony that was believable, consistent, and sufficiently detailed so as to provide a plausible and coherent account for the basis of his alleged fear of persecution on behalf of himself, his wife, and son and daughter"; and (2) "substantially embellished his asylum claim from the time he arrived in the United States until

[the evidentiary hearing.]"[9]  The IJ discussed that, to the extent that Eriketa

Musaka had testified about her fear of returning to Albania, she had "not shown

that the Albanian government would not be able to protect her."  Furthermore, the

IJ determined that Demirali Musaka's testimony regarding persecution he suffered

while working in the camp before 2001 was too remote to the claims at issue in his

asylum claim because the petitioners did not leave Albania until 2002.[10]

The petitioners appealed the IJ's decision to the BIA, arguing that the IJ

erred in denying them asylum because, regardless of Musaka's actual political

opinion, he established that he was threatened based entirely, or at least in part, on

his imputed political opinion.  The BIA dismissed their appeal, explaining as

follows:

> We have reviewed the record and we agree that the lead respondent
> failed to meet his burden of establishing past persecution or a well-
> founded fear of persecution on account of one of the statutorily
> protected grounds, or that it is more likely than not that the
> respondents will be persecuted or subjected to torture upon their
> return to Albania. . . .  The respondents have presented no arguments
> on appeal which persuade us that this decision should be disturbed.
> Accordingly, the appeal is dismissed.

---

[9]  In giving this explanation, the IJ noted inconsistencies between sworn statements made
by the petitioners, including (1) conflicts between Musaka's statements and those of his family
members; and (2) differences in Musaka's testimony on (i) the dates on which the harassment
occurred, (ii) the number of men who approached Musaka, and (iii) the political organizations to
which Musaka belonged.

[10]  Because the petitioners have not challenged on appeal this last finding, we conclude
that any arguments on it have been abandoned.  See Sepulveda, 401 F.3d at 1228 n.2.

On appeal, the petitioners generally argue that the IJ erred in determining that they did not establish a well-founded fear of persecution because they presented "substantial testimony" to the contrary. The petitioners contend that, in questioning Musaka's credibility, the IJ (1) erroneously found it to be inconsistent with statements he made during his credible-fear interview, and (2) overlooked Musaka's 2001 meeting with Berisha. The petitioners assert that Musaka's fear that his wife and daughter would be forced into prostitution was supported by information in the 2002 Country Report. They also argue that, to the extent the State Department's reports did not support their asylum claim, these reports likely were colored by the fact that the United States presently has a good relationship with Albania. Finally, the petitioners summarily argue that, although they did not have to produce corroborating evidence to prevail because Musaka gave credible testimony that established both a subjective and an objectively reasonable fear, they provided such evidence when it was available.

Because the BIA did not expressly adopt the IJ's opinion in the instant case, we review only the BIA's decision. See Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (holding that we "review only the [BIA's] decision, except to the extent that it expressly adopts the IJ's opinion"). To the extent that the BIA's decision was based on a legal determination, our review is de novo. D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 817 (11th Cir. 2004). On the other

10

hand, the BIA's factual determinations are reviewed under the substantial evidence test, and we "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Al Najjar, 257 F.3d at 1283-84 (quotation and marks omitted). Thus, the BIA's factual determinations will be reversed "only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc), cert. denied, 125 S.Ct. 2245 (2005).

As a preliminary matter, if credible, an alien's testimony may be sufficient to sustain the burden of proof without corroboration. Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287 (11th Cir. 2005). "Conversely, an adverse credibility determination alone may be sufficient to support the denial of an asylum application." Id. However, we have determined that, when an IJ "says not that [the IJ] believes the asylum seeker or [that] [the IJ] disbelieves her . . . the reviewing Court is left in the dark," and that an IJ must make a "clean determination[] of credibility." Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir. 2005) (internal quotations omitted). Thus, we concluded in Yang that, although the IJ made a reference to the petitioner's claim as a "ridiculous fabrication" and stated that his testimony was "extremely inconsistent and [made]

11

absolutely no sense whatsoever," these statements did not constitute an adverse credibility determination that was dispositive on appeal.  Id.

Here, the IJ explained that Demirali Musaka had "failed to provide testimony that was believable, consistent, and sufficiently detailed so as to provide a plausible and coherent account for the basis of his alleged fear of persecution on behalf of his self, his wife, and son and daughter."  The IJ also discussed that Musaka had "substantially embellished his asylum claim from the time he arrived in the United States until [the evidentiary hearing]," along with noting multiple inconsistencies between Musaka's statements during the evidentiary hearing and those he made in his sworn statement and his credible fear interview.  Similar to the facts in Yang, however, the IJ did not clearly state that she was making an adverse credibility finding.  See Yang, 418 F.3d at 1201.  Moreover, the BIA, in affirming the IJ's opinion, found only that the petitioners had failed to show a well-founded fear of persecution.  We, therefore,  conclude that neither the IJ nor the BIA made an adverse credibility determination that is dispositive on appeal.

An alien who arrives in, or is present in, the United States may apply for asylum.  INA § 208(a)(1), 8 U.S.C. § 1158(a)(1).  The Secretary of Homeland Security or the Attorney General has discretion to grant asylum if the alien meets

the INA's definition of a "refugee."  INA § 208(b)(1), 8 U.S.C. § 1158(b)(1).[11]  A

"refugee" is defined as

> any person who is outside any country of such person's nationality or,
> in the case of a person having no nationality, is outside any country in
> which such person last habitually resided, and who is unable or
> unwilling to return to, and is unable or unwilling to avail himself or
> herself of the protection of, that country because of persecution or a
> well-founded fear of persecution on account of race, religion,
> nationality, membership in a particular social group, or political
> opinion . . ..

INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A).  "The asylum applicant carries

the burden of proving statutory 'refugee' status."  D-Muhumed, 388 F.3d at 818.

To establish asylum eligibility, the petitioner must, with specific and

credible evidence, demonstrate (1) past persecution on account of a statutorily

listed factor, or (2) a "well-founded fear" that the statutorily listed factor will cause

future persecution.  8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.  If the

petitioner demonstrates past persecution, there is a rebuttable presumption that he

has a well-founded fear of future persecution.  8 C.F.R § 208.13(b)(1).  If he

cannot show past persecution, then the petitioner must demonstrate a well-founded

fear of future persecution that is both subjectively genuine and objectively

reasonable.  Al Najjar, 257 F.3d at 1289.  The subjective component can be proved

---

[11]  Pursuant to the REAL ID Act of 2005, INA § 208(b)(1), 8 U.S.C. § 1158(b)(1), was amended to add "The Secretary of Homeland Security or the Attorney General," as if enacted on March 1, 2003.  See Pub.L. 109-13, 119 Stat. 231 (May 11, 2005), Division B, Sec. 101, 8 U.S.C. § 1158(b)(1) and note (1).

13

"by the applicant's credible testimony that he or she genuinely fears persecution," while the objective component "can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Id. (quotation omitted).

The applicant must present "specific, detailed facts showing a good reason to fear that [s]he will be singled out for persecution on account of such an opinion." Id. at 1287. "Persecution on account of . . . political opinion . . . is persecution on account of the victim's political opinion, not the persecutor's." Sanchez v. U.S. Att'y Gen., 392 F.3d 434, 437-38 (11th Cir. 2004) (quotation omitted) (emphasis in original). Moreover, evidence that either is consistent with acts of private violence, or merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground. Id. at 438.

Here, Musaka testified that (1) he became active with the DP in 1991; (2) he served the DP during elections in March 1992, October 1996, and June 1998, as a "member of [the] election commission"; and (3) during a meeting in 2001, he and 20 other party members met with Sali Berisha, the DP's national political candidate, and shook hands in front of the crowd. Musaka also produced a copy of his DP membership card. Additionally, Musaka testified about two extortion attempts in March 2002, when armed men in masks demanded from him $100,000,

14

in exchange for not (1) forcing Musaka's wife and daughter into prostitution, and (2) killing Musaka's son.

However, outside of Musaka stating that he believed that he had been targeted for this extortion because he was one of the more active members of the DP, and because he did not have any protection, he did not present "specific, detailed facts" showing that his participation in the DP was causally connected with the extortion attempt, or that he had an objective well-founded fear of future persecution based on this membership. See Al Najjar, 257 F.3d at 1287. Indeed, Musaka conceded that these masked men told him that they knew he had family overseas and they, therefore, believed that Musaka had money to give them. Musaka also agreed that the men did not refer to his political affiliation. Similarly, Musaka's daughter testified that her father only thought that the persons who had threatened him were socialists. Although Musaka produced general articles relating to country conditions in Albania, he did not produce documents corroborating his testimony as to the extortion. See Yang, 418 F.3d at 1201 (explaining that "[t]he weaker an applicant's testimony . . . the greater the need for corroborative evidence"); see also Perlera-Escobar v. Executive Office for Immigration, 894 F.2d 1292, 1298-99 (11th Cir. 1990) (noting that we must affirm the BIA's decision that there exists no nexus between the harassment and a

15

protected ground, even if other inferences about motive may be drawn, so long as substantial evidence supports the BIA's conclusion).

Additionally, both the 2001 and the 2002 Country Reports for Albania included that, instead of being politically driven, many killings that occurred throughout the country were "the result of individual or clan vigilante actions connected to traditional 'blood feuds' or criminal gang conflicts." Moreover, there were some improvements in human rights, including a decrease in the number of violent incidents from the previous year. Although Musaka is arguing that these reports are biased because the United States is currently is friendly with Albania, and he produced news articles generally documenting continued human rights violations in Albania, this evidence does not compel a conclusion that the BIA improperly relied on the 2001 Country Report. See Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004) (explaining that the BIA was entitled to "rely heavily" on State Department reports).

Finally, as the petitioners contend, Musaka's daughter testified that she believed that she and her mother were in danger of being forced into prostitution. Moreover, both the 2001 and 2002 Country Reports included that trafficking in persons remained a serious problem in Albania, and that the police were involved, either directly or indirectly in the trafficking in persons. Nevertheless, a contrary conclusion is not compelled by this evidence because, as discussed above, the

16

petitioners failed to demonstrate a well-founded fear that they will be singled out for persecution on account of Musaka's membership in, and activities with, the DP. See Sepulveda, 401 F.3d at 1232 n.7 (affirming IJ's opinion denying asylum despite the inclusion in the relevant country reports that guerillas exercised influenced throughout Colombia because the petitioner had failed to establish that she would be singled out for persecution on account of a protected ground).

Accordingly, we conclude that the record does not compel us to conclude that the petitioners established statutory eligibility for asylum, and the BIA's determination was supported by substantial evidence. We, therefore, deny the petitioners' petition for review.

**PETITION DENIED.**