[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 05-13361
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 21, 2006
THOMAS K. KAHN
CLERK

BIA  No. A78-410-659

SHIZHUANG ZHENG,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals
_____

**(March 21, 2006)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Shizhuang Zheng petitions for review of the final order of the Board of

Immigration Appeals ("BIA") adopting without opinion the order of the

immigration judge ("IJ'") denying asylum and withholding of removal under the

Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1158, 1231, and relief under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. § 208.16(c). Because we find no substantial support in the record for the IJ's adverse credibility determination, which was based in large measure on his personal knowledge of Falun Gong, we GRANT Zheng's petition, VACATE the decision as to INA relief, and REMAND the case to the BIA for disposition consistent with this opinion.

## I. BACKGROUND

Zheng was issued a notice to appear ("NTA") by the former Immigration and Naturalization Service ("INS"). The NTA charged him with being a native and citizen of China who was paroled, as an immigrant, into the United States at Nassau, Bahamas on 7 March 2002, and who, at the time of his application for admission, was not in possession of a valid visa or other documentation required by the INA. Zheng admitted to the allegations of the NTA and the matter was referred to an IJ.

Zheng filed an application for asylum, withholding of removal under the INA, and withholding of removal under CAT. In his application, Zheng claimed that he feared persecution based on political opinion because, if he returned to China, the government there would "beat [him] up, fine [him], and put [him] into a reeducation-through-labor camp because [of his being] a Falun Gong practitioner."

2

Administrative Record ("AR") at 221.  He claimed that he had practiced Falun

Gong since July 2000, when a coworker began teaching him the exercises, and that

police in Guantou had detained him on two separate occasions for being a Falun

Gong practitioner: in March 2001 for a one-day period and in April 2001 for a two-

or three-day period.  Id. at 222, 226.  As to the March 2001 detention, the

application states that, while Zheng and his coworker were practicing Falun Gong

exercises in his coworker's house, the police apprehended and detained them,

depriving them of food and beating them when they spoke.  Id. at 226.  The

following day, local residents bailed Zheng and his coworker out of jail, and the

police directed them to stay at home, stop practicing Falun Gong, and report to the

police once per month.  Id.  Zheng and his coworker did not subsequently stop

practicing Falun Gong and tried to avoid the police by using a different

practitioner's house.  Id.  In April 2001, the application states, police once again

apprehended Zheng and fellow practitioners, detaining them for three days during

which they were all deprived of food and drink and "cruelly beaten."  Id.  Also

during this second detention, the police cut Zheng's middle finger and denied him

medical treatment.  Id.  In response to the pleas of "ethnic group leaders," the

police released Zheng and the others, ordered them to remain at home and report to

the police twice per month, and threatened them with death should they ever again

be caught practicing Falun Gong.  Id.  The application reports that, after returning

3

home, where he had his finger treated, Zheng hid at his aunt's house, and then fled China for the United States.  Id.

Zheng also wrote in his 2002 application that his brother, Shi Jing Zheng, "is applying asylum [for] in the United States and his case is currently pending."  Id. at 223.  Although Zheng had been in Cuba, Haiti, and the Bahamas prior to arriving in the United States, he explained that he did not apply for asylum in any of these locations because he was "controlled by the smugglers."  Id.  Zheng's application statement is written in his native language of Chinese, and was submitted along with a certification by a translator that it had been accurately translated into English.  Id. at 227-29.

During a scheduling hearing in the case, the IJ professed an extensive personal knowledge of Falun Gong.  Id. at 52.  More specifically, he claimed "I did a year's worth of Falun Gong.  So . . . I can tell you I do Falun Gong standing on my head."[1]  Id. at 52.  At the asylum hearing itself, when the IJ asked Zheng what Falun Gong was, Zheng responded that it was "a kind of mental[] exercise . . . which teach us . . . to be good person, not to do evil things."  Id. at 64-65.  He explained that he had first started practicing it approximately once a week in July 2000, after one of his coworkers introduced him to it.  Id.  Zheng further explained

---

[1]At the same hearing, the IJ also commented that he needed at least three hours for the asylum hearing because "Falun Gong's take forever.  Because I, I question them until I, until I make sure everything is true and correct."  Id. at 52.

4

that the practice of Falun Gong also involved doing five sets of movements with his hands, arms, shoulders, and entire body. Id. at 66. Zheng testified that he began practicing Falun Gong in order to improve his health, because he frequently contracted the flu, and conventional medical treatment had not been effective. Id. at 67-68. Zheng explained that he could not remember the name of the conventional doctor who had treated him because the medical clinic in his village had a constantly changing staff. Id. 68-69. Zheng testified that he had practiced only four of the five Falun Gong sets at the house of his coworker. Id. at 72.

Zheng recounted how, in March 2001, five or six police officers had come to his co-worker's house, possibly following a report from a third party, and arrested them. Id. at 74. According to Zheng, the police did not beat him during this March arrest and detention, but they did hold him for one day and threaten him. Id. at 75-76. When asked to explain the conflict between his testimony at the hearing and the statement in his asylum application that he had been beaten during the March detention, Zheng answered that he had actually said, in filling out the application, that the police had beaten *someone else* during the March detention. Id. at 108. Zheng explained that despite the warning from police to stop practicing Falun Gong, he continued practicing because he believed it improved his health. Id. at 76. He further stated, "For myself, I think this is a good exercise. I did not steal, I did not beat people, I did not rob." Id.

5

Zheng testified that he was arrested again on or about 17 April 2001 for practicing Falun Gong at a different house. Id. at 79-80. During the three-day detention following his arrest, Zheng testified, the police beat him and did not allow him to eat, drink, or talk. Id. at 80-81. He testified that during this second detention his face was covered with a cloth, he was slapped and beaten about the head and chest with a stick, and police officers cut his middle finger with a paper cutter. Id. at 81-82. He claimed to have sustained bruises and swelling of his face, chest, and back, as well as the cut on his finger. Id. at 83-84. The police did not provide him with medical attention. Id. at 85.

On the fourth day of this detention, the police released Zheng. Id. at 85. That same day, he went to Guang Tong Hospital for treatment of his finger. Id. at 86. When he was released from the second detention, the police told Zheng to report to them every fifteen days, but, Zheng testified, he failed to comply for fear of further beatings. Id. at 90, 92.

Zheng then explained that he spent ten days at his parents' home, one month at his uncle's home, eighteen days in a hotel, six days in Hong Kong, thirty-four days in Cuba, ten days in Haiti, and seven months in the Bahamas before coming to the United States. See id. at 95-98. In questioning Zheng about how he was able to pay for the plane tickets all this travel would have required, the IJ accused

6

Zheng of participating in a "snakehead" (immigrant smuggling) operation.[2]  Id. at

101.  Zheng did not comment.  When asked what he thought would happen to him

should he return to China, Zheng testified that he was not sure but again mentioned

the injury to his finger.  Id. at 103.

The IJ then questioned Zheng closely about the extent of his practice of

Falun Gong in the United States.  Zheng claimed to have practiced Falun Gong

nearly every weekend while he was in Cuba, Haiti, and the Bahamas.  Id. at 104.

Zheng testified that he practiced Falun Gong in "Grand Street Park" while residing

in New York.  Id. at 104-05.  He admitted that he did not have pictures of himself

practicing or affidavits from witnesses who had seen him practicing.  Id.  Zheng

explained that he could not find a Falun Gong organization in New York, so he

practiced on his own or with people in the park.  Id. at 114.  In response to a

question from the IJ, he further explained that he had practiced with others in

China, even though he could have practiced by himself, because he wanted to

"communicate with the different people."  Id. at 115.

Zheng also testified at the hearing that his brother had just arrived in the

United States on 27 January 2004.  Although this appears to conflict with the

information he gave in his asylum application, there is some confusion in the

_____

[2]Zheng himself claimed, in his asylum application, that he did not apply for asylum in
any other country through which he traveled because he was "controlled by the smugglers."  Id.
at 223.

record as to whether he might actually have meant 2002.[3]  The IJ concluded that because the translator had used the words "just arrived" at the hearing, he must have meant 2004, making the testimony inconsistent.  Id. at 108-09.

The 2002 State Department Country Report on Human Rights Practices in China ("Report") indicates that the Chinese government maintained a poor human rights record, continuing to perpetrate numerous abuses, including "torture and mistreatment of prisoners, forced confessions, and arbitrary arrest and detention." Id. at 120.  The Report refers to Falun Gong as a "spiritual movement," upon which the Chinese government began a crackdown in 1999, resulting in the incarceration of thousands of practitioners in prisons, extrajudicial reeducation-through-labor camps, psychiatric facilities or special deprogramming centers, and "[s]everal hundred Falun Gong adherents reportedly have died in detention due to torture, abuse and neglect."  Id. at 121-22.  According to the Report, punishment for merely believing in Falun Gong ranged from loss of employment to imprisonment.  Id. at 138.  The vast majority of adherents detained were eventually released, but "core leaders" were singled out for particularly harsh treatment.  Id. A 2001 campaign initiated by the Chinese government led to practitioners, even private ones, being forced to attend anti-Falun Gong study sessions.  Id. at 139. The Report also notes that some members had problems obtaining passports.  Id. at

---

[3]The government asked Zheng whether he actually meant 27 January 2002.  Id. at 109.

8

140.  Finally, the Report observes that "[p]ersons trafficked by alien smugglers paid high prices for their passage to other countries, where they hoped that their economic prospects would improve." Id. at 151.

Also in the record were written materials describing Falun Gong as a practice related to "the Buddha School" and based on the Falun, or "law wheel," rotating in the abdomen, which, through practice, converts into Gong, or "cultivation energy." Id. at 181.  The materials assert that the "Falun can cure diseases and get rid of evils for others, rectifying all abnormal conditions." Id. They also indicate that constant practice is not required to maintain the Falun, "as long as [the practitioner] regards [him]self as a cultivator and follow[s] Xingxing (mind nature)." Id. at 191.  They recommend practicing "as much as you can when you do have time [and] practic[ing] less when you do not.  It is very informal." Id. at 184.   The materials specify that it does not matter where you practice – inside or outside – or in what direction you face while doing so. Id. at 199.  The materials also clarify that disease may reappear during Falun Gong practice and that taking medication during cultivation implies that the practitioner does not believe in the practice. Id. at 193.  Contracting symptoms similar to a cold or a fever after finishing a Falun Gong class is considered a "passing of a tribulation or hardship, and implies that improvement onto another level [of Falun Gong practice] is due." Id. at 196.  There are five sets of exercises to practice, and the first set, which does

9

not involve standing, should be practiced before the other sets. Id. at 201-02. It is not necessary to practice all five sets each time. Id.

In an oral decision, the IJ found Zheng "totally incredible," based in part on the fact that he had heard "hundreds and hundreds of Falun Gong cases, and [Zheng's was] probably the only one [the IJ had] heard with not a shred of corroboration about anything salient to his case." Id. at 18. More specifically, the IJ found Zheng lacked credibility due to (1) inconsistencies between Zheng's application and his hearing testimony regarding (a) whether he was beaten during his March 2001 detention and (b) the timing of his brother's arrival in the United States, id. at 24-25; (2) Zheng's "sniffling like crazy" during the hearing, despite his claim that he practiced Falun Gong because it "fixed him up," id. at 19;[4] (3) Zheng's admission that he occasionally practiced Falun Gong indoors and by himself, in light of the IJ's personal knowledge that Falun Gong was to be practiced outdoors and in groups, id. at 21-22; (4) Zheng's not having affirmatively stated that he had read a book written by Falun Gong's leader and his inability to explain, to the IJ's satisfaction, the five Falun Gong movement sets in spite of the fact that he had "risked his life" to be able to practice it, id. at 22-23; and (5) Zheng's inability to give the name of his doctor in China, id. at 22-23. The IJ

---

[4]The IJ commented on Zheng's sniffling twice during the hearing. The second time, he appeared almost hostile about it: "Still sniffling, huh? . . . Here, I'll give you a tissue. Yeah. Go ahead, have a nice tissue on the Court. Here. Go ahead." Id. at 101.

also expressed concern over (1) Zheng's failure to produce evidence to corroborate his claim that he practiced Falun Gong with a group of people in New York despite its being one of the largest Chinese communities in the United States, id. at 19; (2) Zheng's failure to corroborate the abuse he suffered in China by way of medical records or an affidavit from his brother residing in the United States, id. at 20, 23, 26, 27; and (3) Zheng's never having been arrested or otherwise harassed while at his own house despite his failure to report to the police as allegedly instructed; id. at 20, 28.  The IJ briefly stated the legal standards for asylum, withholding of removal, and CAT relief, and denied Zheng's applications, declaring, "I don't find him credible.  There's not a shred of corroboration.  He has less than a working knowledge of Falun Gong and what it means, and the religious, social connotations and what it's all about."  Id. at 29-30.

Zheng appealed, asserting in his Notice of Appeal that his testimony was credible and corroborated by known country conditions in China.  Id. at 13.  Although Zheng indicated an intention to file a "separate written brief or statement" after filing his Notice of Appeal, see id. at 11, it does not appear from the record that he ever did so.  The BIA affirmed, adopting the IJ's decision without opinion.[5]  In his petition for review, Zheng argues that the IJ's adverse

---

[5]Although the briefing notice in the case warns the appellant that failure timely to file a brief or statement, when the Notice of Appeal has indicated that one will be filed, may result in a summary dismissal of the appeal pursuant to 8 C.F.R. § 1003.1(d)(2)(i)(E), see id. at 2, and

11

credibility finding was erroneous because it was based on: (1) only minor inconsistencies between Zheng's asylum application and hearing testimony, which were immaterial to whether he had or would suffer persecution by the Chinese government for his Falun Gong membership; and (2) the IJ's speculation and conjecture about Zheng's experiences.

## II. DISCUSSION

When the BIA issues a decision, we review only that decision, "except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001). We review the IJ's opinion in this case because the BIA has adopted it in full. See D-Muhumed v. U.S. Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004). We review legal determinations by the IJ de novo. Id. at 817. We examine factual findings, including determinations of credibility, however, under the substantial evidence test. Id. at 817-18. Under this test, we "must affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence *on the record* considered as a whole." Id. at 818 (citation omitted and emphasis added). "To reverse the IJ's fact findings, we must find that the record not only supports reversal, but compels it." Mendoza v. U.S. Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). That evidence in the "record may support a contrary

despite the government's motion for summary dismissal, the BIA instead took the appeal and affirmed the IJ's decision pursuant to 8 C.F.R. § 1003.1(e)(4). See id. at 1.

12

conclusion is not enough to justify a reversal." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004), cert. denied, __ U.S. __, 125 S. Ct. 2245 (2005).

An alien who arrives in or is present in the United States "may apply for asylum." 8 U.S.C. § 1158(a)(1). To qualify for asylum, the alien must be a "refugee." Id. § 1158(b)(1)(A). A "refugee" is any person who is unwilling to return to his home country or to avail himself of that country's protection "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). The asylum applicant "bears the burden of proving such statutory 'refugee' status." Al Najjar, 257 F.3d at 1284 (citing 8 C.F.R. § 208.13(a)). An applicant satisfies this burden by showing, with specific and credible evidence: (1) past persecution on account of a statutorily listed factor, or (2) a "well-founded fear" that his statutorily listed factor will cause future persecution. 8 C.F.R. § 208.13(a), (b); Al Najjar, 257 F.3d at 1287.

To establish a "well-founded fear," "an applicant must demonstrate that his or her fear of persecution is subjectively genuine and objectively reasonable." Al Najjar, 257 F.3d at 1289. A "well-founded fear" of persecution may be established based on past persecution on account of race, religion, nationality, social group membership, or political opinion that creates a presumption of a "well-founded fear" when not rebutted by the INS. 8 C.F.R. § 208.13(b)(1). A well-founded fear

13

may also be established based on a reasonable possibility of future personal

persecution that cannot be avoided by relocating within the subject country.  Id. §

208.13(b)(1), (2)(ii).  Nevertheless:

> [An] immigration judge shall not require [an asylum] applicant to
> provide evidence that there is a reasonable possibility he or she would
> be singled out individually for persecution if: (A) [t]he applicant
> establishes that there is a pattern or practice in [the subject country] . .
> . of persecution of a group of persons similarly situated to the
> applicant . . . and (B) [t]he applicant establishes his or her own
> inclusion in, and identification with, such group.”

Id. § 208.13(b)(2)(iii).

"The testimony of the applicant, if credible, may be sufficient to sustain the

burden of proof without corroboration."[6] Id. §§ 208.13(a), 208.16(b).  On the other

hand, "an adverse credibility determination alone may be sufficient to support the

denial of an asylum application."  Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1287

(11th Cir. 2005).  "The weaker an applicant's testimony . . . the greater the need for

corroborative evidence."  Yang v. U.S. Att'y Gen., 418 F.3d 1198, 1201 (11th Cir.

2005).  In making an adverse credibility determination, however, an IJ must offer

"specific, cogent reasons."  Forgue, 401 F.3d at 1287.  "[M]inor inconsistencies

---

[6]The REAL ID Act of 2005 amended the law regarding credibility determinations by adding 8 U.S.C. § 1158(b)(3)(B)(iii), to permit an adverse credibility finding based on any inconsistencies, regardless of their relevance to the applicant's asylum eligibility. Pub. L. No. 109-13, § 101(a)(3), (d), 119 Stat. 321, 303, 304-305.  The Act states, however, that these provisions "shall apply to applications for asylum, withholding, or other relief from removal made on or after" the date of enactment of the act, which was 11 May 2005.  Pub. L. No. 109-13, § 101(h)(2), 119 Stat. at 305.  Therefore, because Zheng's application for asylum was filed before 11 May 2005, these provisions do not apply in this case.

14

and minor admissions that 'reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding.'" Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002) (citation omitted); see also Chebchoub v. INS, 257 F.3d 1038, 1043 (9th Cir. 2001). Further, "an adverse credibility determination does not alleviate the IJ's duty to consider other evidence produced by an asylum applicant." Forgue, 401 F.3d at 1287. Nevertheless, when the IJ enumerates an applicant's inconsistencies and *is supported by the record*, "we will not substitute our judgment for that of the IJ with respect to its credibility findings." D-Muhumed, 388 F.3d at 819.

In this case, most of the alleged inconsistencies and other weaknesses that the IJ cites in support of his determination are sufficiently explained by the record.[7] As to the March beating, Zheng explained that he had actually said in his application (which was translated from the Chinese by someone else) that one of the other detainees had been beaten. He was not further questioned about this, and the IJ offered no specific or cogent reason for disbelieving the explanation. As to the doctor's name, Zheng explained that the clinic he attended was staffed by

[7]These include, whether he was actually beaten during his March detention, the timing of his brother's arrival in the United States, his failure to remember the name of the conventional doctor in his home village, his failure to produce corroborating medical evidence of the physical abuse he suffered in China, and his never having been arrested or harassed after failing to report to the police as instructed. The last of these, as the government concedes, involves impermissible speculation in the first place. See Appellee Br. at 21.

people from outside the village and was constantly changing. The IJ neither pursued this further nor offered any specific or cogent reason for disbelieving it. The IJ never asked Zheng to explain why he failed to submit corroborative evidence of his physical abuse. His proffered reasons for concern were all based on his experience with other Falun Gong cases rather than on the record in this case. None of them provides an adequate basis for an adverse credibility finding.

Even if these perceived inconsistencies had not been adequately explained by the record, each of them is irrelevant to the question of whether Zheng has established both that there is a pattern or practice of persecution of Falun Gong followers in China and that he is himself a Falun Gong follower. Accordingly, they "reveal nothing about [his] fear for his safety [and] are not an adequate basis for an adverse credibility finding.'" See Gao, 299 F.3d at 272 (citation omitted); Chebchoub, 257 F.3d at 1043.

The IJ's primary concern, however, is Zheng's credibility with respect to his knowledge and practice of Falun Gong. This, on the other hand, is central to Zheng's ability to establish a well-founded fear of persecution – to show that he is a member of a statutorily protected group subject to a pattern or practice of persecution. Each of the points upon which the IJ expresses concern based on his personal knowledge of Falun Gong, however, is contradicted by the record.

16

The IJ first points to Zheng's testimony that he only practices Falun Gong on weekends, saying "It doesn't make any sense." AR at 19. During the hearing, when the IJ asked him to explain why he did not practice more often, he never permitted Zheng time to respond saying " OK. Well, what about the rest of the week? If you had off, you had five days off, and two days Falun Gong. Is that the way it worked? Yeah, okay. And, and, and, you live now, where?" Id. at 104. Zheng did explain, however, with reference to questions regarding which of the steps he practiced, that he practiced Falun Gong to the extent he had time to do so: "[I]f you have time you can practice more, but if you don't have time, there's no need to finish . . . all the steps." Id. at 72. The explanation is entirely consistent - both with respect to amount of practice and approach to sets – with the practice rules described in the Falun Gong materials included in the record. See id. at 183-84, 201-02.

The IJ next finds Zheng's responses to questions regarding the nature of Falun Gong insufficient to show that "he kn[ew] anything" declaring Zheng's responses to be "as instructive as opening a fortune cookie" and "quite off-the-wall." Id. at 20. Zheng testified, at various points during the hearing that Falun Gong was a "mental[] exercise" involving sets of five movements done with anything from just the arms to the entire body. Id. at 64, 66. He also described the Falun as "a kind of miniature of the universal" and explained that "if [he]

17

practice[s] the Falun Gong, that means the Falun is close in [his] belly." Id. at 113-14. He first stated that Falun Gong taught its followers "to be good . . . not to do evil things," and later also responded that a customary – but not religious– purpose of practicing Falun Gong is "to improve the health." Id. at 64,114. All of this is consistent with the record materials on Falun Gong and not – as the IJ terms it – "off-the-wall." See id. at 178, 181.

In his oral opinion, the IJ explains that some of his concerns about Zheng's answers regarding Zheng's knowledge and practice of Falun Gong arise from the fact that

> Every single case I have ever heard of Falun Gong was that the desired practice of Falun Gong is in the outdoors in an open area in the company of many other practitioners . . . [b]ecause there is a collective energy that they believe flows from the universe and flows from the collectivism of practicing this together.
> . . .
> Now, here I got just the opposite. [Zheng testified that he] went privately, the first thing into a house, never went into a park in [his] whole li[f]e. Is it possible? Sure. Do I believe it? Based on this Court's experience, no I do not.

Id. at 21-22.

First, Zheng testified that he did practice in a park with other people in New York. Second, that he practiced alone and indoors some of the time, particularly when he was still in China, is entirely consistent with what the record materials say about appropriate practice methods. See id. at 193,199.

18

Later in the opinion, the IJ questions Zheng's apparent failure to get beyond

the fourth set of movements.  Id. at 23.  The IJ explains his understanding that

> Falun Gong . . . is an advancement in a step process which
> incorporates various taoism, buddhism, and eastern metaphysical
> religions and other recognized religions of betterment, of moving
> yourself along to each step to a higher plane so that you become, not
> just well, yeah, I'm a better person, I read that as, again, out of a
> fortune cookie.  What is Falun Gong?  Better person.  There's a little
> bit of explanation that goes, if you're going to convince the Court that
> you're sincere and you know what you're talking about."

Id. at 23-24.  As noted, the record reflects that Zheng did, in fact, go beyond

simply saying that Falun Gong makes you a better person.  An adverse credibility

determination must be supported by the record.  The IJ's own personal knowledge

or experience of Falun Gong does not constitute a portion of the record,

particularly not when it is directly contradicted by materials that are a part of that

record.

The IJ also points out, "I didn't hear a word that he ever read anything [by

Falun Gong's leader].  His counsel gave him an opportunity, said well, where did

you learn about this.  Oh I went to my one friend's house."  Id. at 22.  At no time in

the course of the hearing, however, was Zheng ever asked whether he had read

anything about Falun Gong.

The IJ describes his experience in other Falun Gong hearings in which

applicants have testified that they do Falun Gong because, "[u]nder the constitution

19

of China [they] are free to associate and do certain things together, and since [they] weren't] hurting [anyone], and it's [their] right as [] Chinese citizen[s], even though [they are] arrested for it, which [is] illegal in and of itself." Id. at 25. He asserts that Zheng made no such statement, but claimed only to do Falun Gong for his health. Id. Zheng, when asked why he continued to practice after being arrested the first time, did respond: "Because my health has improved much better since I practice Falun Gong. So that was not a kind of the bad things for me." Id. at 76. Zheng further explained, however, "For myself, I think this is a good exercise. I did not steal, I did not beat the people, I did not rob." Id. at 76. It is clear throughout the transcript of this hearing that there was a significant language barrier problem, even with the translator. To the extent that this complex point is an important one for a Falun Gong asylum applicant to make, the record reflects that Zheng touched upon it.

The IJ also expresses concern over Zheng's testimony that he could not find a Falun Gong organization in New York. Once again based on his own observations, the IJ further explained:

> I have seen pictures of people openly protesting, in the United States, China's policies on Falun Gong. The Internet has a million websites for Falun Gong, and where you can practice it. It's a very open thing, which is one of the problems the People's Republic is having in trying to contain Falun Gong, because everybody in China now seems to be coming on board the computer net.

20

Id. at 29.  None of this has any basis in the record.

Although many of the reasons given by the IJ for his disbelief that Zheng was a true practitioner of Falun Gong were specific and cogent, none of them was based on the Falun Gong materials in the record or supported thereby.  Because our review is limited to that record, we are thus compelled to reverse the adverse credibility determination.  See D-Muhumed, 388 F.3d at 819.

### III. CONCLUSION

Zheng petitions for review of the final order of the BIA, which adopted the decision of the IJ, ordering his removal, and denying asylum and withholding of removal under the INA and CAT.[8]  Because the IJ's adverse credibility finding was based on his own knowledge of Falun Gong, and was not supported by the record, we are compelled to reverse it.  Accordingly, we **GRANT** the petition for review, **VACATE** the decision as to INA relief, and **REMAND** to the BIA for further proceedings to determine whether, accepting Zheng's testimony as credible, he is entitled to asylum or withholding of removal.

---

[8]Because there is no more than a passing reference to it in the conclusion to Zheng's brief on appeal, Zheng has abandoned the issue of whether he established eligibility for withholding of removal under CAT.  See Sepulveda v. U.S. Attorney Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam) ("When an appellant fails to offer argument on an issue, that issue is abandoned"); Mendoza, 327 F.3d at 1286 n.3 (11th Cir. 2003) (respondent abandoned his CAT claim because he did not raise it in his appellate brief).