[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT 22, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-16519
Non-Argument Calendar

_____

Agency No. A78-588-582

AZA JANELIDZE,
NODAR JANELIDZE,

                                                            Petitioners,

versus

U.S. ATTORNEY GENERAL,

                                                            Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(September 22, 2006)**

Before DUBINA, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

    Petitioner Aza Janelidze ("Janelidze"), an ethnic Ossetian who is a native

and citizen of Georgia, along with her husband, Petitioner Nodar Janelidze

("Nodar"), also a citizen of Georgia, seek review of the Board of Immigration Appeals' ("BIA") decision affirming the Immigration Judge's ("IJ") denial of their application for asylum. Janelidze argues that the IJ erred as a matter of law in not granting her asylum and withholding of removal.[1] Janelidze contends that she properly established past persecution based on both her Ossetian ethnicity and on her imputed political opinion relating to the civil struggles between Ossetians and Georgians.

## I. BACKGROUND

Janelidze sought to establish past persecution and fear of future persecution based upon two incidents that occurred in Georgia. She testified that she began working as a telephone operator in the Georgian government post office in 1990. During the course of her work, Janelidze listened to conversations of Georgians who wanted to raid Ossetian villages. She passed the information that she heard along to a friend, David, who then passed the information on to her family so that they could seek safety.

Janelidze testified that in 1990,[2] when she was returning home from work,

---

[1]Although Janelidze also sought and was denied CAT relief below, in her appellate brief, she does not argue the CAT claim at all. Accordingly, that claim is deemed abandoned. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n. 2 (11th Cir. 2005) (abandonment decision).

[2]Although Janelidze initially testified that the first incident occurred in 1990, during the IJ's questioning regarding differing dates that she provided for these incidents in her application, Janelidze testified that she could not recall the dates.

two men met her and asked her to tell them everything that she had heard during these conversations. When she told the men that she did not know anything, they hit Janelidze twice. Janelidze testified that she did not know who the men were but that they were in uniform and she thought that they were from the KGB. This account differs significantly from the account provided in Janelidze's declaration. In her declaration, Janelidze stated that two men stopped her in the lobby, as she was going to work, in the summer of 1997. Her declaration states that the men told Janelidze that they were from the Ministry of State Security and that they wanted to talk to her. Janelidze's declaration further states that the men asked her if she had any connections to the Ossetian rebels and informed her that someone had told them that she was passing information to the rebels. According to her declaration, the men hit her in the face twice.

Janelidze testified that the second event occurred during the following fall. According to her testimony, two *different* men came to Janelidze's home and demanded "all the information, otherwise they [would kill her]." The men placed a pistol to Janelidze's head and then in her mouth. They beat Janelidze before leaving. However, this account also differs from Janelidze's declaration. There, Janelidze stated that the *same* two men from the prior incident came to her home. Janelidze also stated in her declaration that, after putting the gun to her head, one

3

of the men said, "[H]e was sick of Ossetians fucking up his country and that he would like to kill [them] all." (R. 596). She also stated in her declaration that the gun was placed in her mouth and she was told that she would be killed unless she told her attackers the names of the Ossetian rebels in Kustavi. Again, this account differs significantly from Janelidze's testimony.

Finally, Janelidze testified that she quit her job and stayed at home for a couple of months after the last incident. She then returned to the same job and worked until she left the country in 1999. Janelidze's husband left Georgia a year earlier, in 1998. They left behind Janelidze's thirteen year old son, who remains with her sister in Georgia.

Although the IJ found that Janelidze's testimony differed at times from her declaration and the interview that she conducted with the asylum officer, the IJ did not specifically make a credibility determination. The IJ concluded that Janelidze failed to carry her burden of proof in establishing past persecution or a well-founded fear of future persecution. The BIA affirmed the IJ's decision.

## II. STANDARD OF REVIEW

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001). Insofar as the BIA does not render its own

4

opinion, but rather adopts the IJ's opinion, then we, in essence, review the IJ's decision. *D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004). Because the BIA adopted the IJ's opinion and issued its own opinion, we review both decisions.

The IJ and the BIA's legal determinations are reviewed *de novo*. *Mohammed v. Ashcroft*, 261 F.3d 1244, 1247-48 (11th Cir. 2001). Factual determinations are reviewed under the substantial-evidence test, and we must affirm the decision below if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. *Al Najjar*, 257 F.3d at 1283-84. The substantial evidence test is deferential and does not allow re-weighing the evidence from scratch. *Mazariegos v. Office of U.S. Att'y Gen.*, 241 F.3d 1320, 1323 (11th Cir. 2001). To reverse an IJ's factual findings, we must find that the record not only supports reversal, but compels it. *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003).

### III. DISCUSSION

To qualify for asylum, an alien must be a "refugee." 8 U.S.C. § 1158(b)(1). A "refugee" includes any person who is unwilling to return to, and is unable or unwilling to avail himself of the protection of, the country of his nationality or where he last habitually resided, because of persecution or a well-founded fear of

persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.  8 U.S.C. § 1101(a)(42)(A).

The burden of proof is on the alien to establish that she is a refugee.  8 C.F.R. § 208.13(a).  "The asylum applicant must establish eligibility for asylum by offering 'credible, direct, and specific evidence in the record.'"  *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005) (citation omitted).  An alien may establish eligibility for asylum if she shows that she has suffered "past persecution" or has a "well-founded fear" of future persecution."  8 C.F.R. § 208.13(a), (b).  Neither the INA nor the regulations define "persecution," but we have stated that persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution.  *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005).

An applicant must also demonstrate that her fear of persecution is subjectively genuine and objectively reasonable.  *Id.*  Establishing a nexus between the statutorily listed factor and the feared persecution requires the alien to present specific, detailed facts showing a good reason to fear that she will be singled out for persecution on account of the statutorily listed factor.  *Id.*  The asylum applicant does not need to show that she will be singled out for persecution if (s)he

6

establishes a "pattern or practice" in his or her country of "persecution of a group of persons similarly situated" and a reasonable fear of persecution on account of a protected ground based on his/her inclusion in that group. 8 C.F.R. § 208.13(b)(2)(iii).

Credible testimony of the applicant may be sufficient to sustain this burden of proof without corroboration. 8 C.F.R. § 208.13(a); *D-Muhumed*, 388 F.3d at 818-19. Conversely, "the IJ's [or BIA's] extremely detailed adverse credibility determination alone may be sufficient to support the IJ's denial of an asylum seeker's application." *D-Muhumed*, 388 F.3d at 818-19. However, "the IJ [or BIA] must offer specific, cogent reasons for an adverse credibility finding." *Forgue*, 401 F.3d at 1287. In *Dailide v. U.S. Attorney Gen.*, 387 F.3d 1335, 1343 (11th Cir. 2004), we affirmed the BIA's adverse credibility determination, which was based upon its finding that the alien's testimony conflicted with his answers to interrogatories, affidavit, deposition, and other documentary evidence. An IJ must make a clean determination of credibility. *Yang v. U.S. Att'y Gen.*, 418 F.3d 1198, 1201 (11th Cir. 2005). In *Yang*, although the IJ referred to the petitioner's claims as a "ridiculous fabrication," and stated that her testimony was "extremely inconsistent and [made] absolutely no sense whatsoever," we concluded that the IJ had not made a credibility finding. *Id.*

Moreover, an adverse credibility determination does not alleviate the IJ or the BIA's duty to consider other evidence produced by an asylum applicant." *Forgue*, 401 F.3d at 1287. When an asylum applicant produces no evidence other than her testimony, an adverse credibility determination is alone sufficient to support the denial of an application for asylum. *Id.* On the other hand, if the applicant produces other evidence of her persecution, it is not sufficient for the IJ or the BIA to rely solely on an adverse credibility determination in those instances. *Id.*

As an initial matter, although Janelidze argues that the IJ erred in making an adverse credibility determination, it is not clear that he made such a ruling, much less an erroneous one. Certainly, the IJ described Janelidze as a "confused and preoccupied, tense witness," noted that there were substantial inconsistencies in her testimony that did not "bode well" for her credibility, and found that it was "quite implausible" for him to believe that she feared returning to Georgia. Nevertheless, these statements do not amount to the "clean" credibility determination we require. Accordingly, we address Janelidze's petition for review as if there had been no adverse credibility determination.[3]

---

[3]To the extent that the IJ may have made an adverse credibility ruling, that conclusion is easy to affirm, especially since Janelidze gave four different years, ranging from 1990 to 1998, for the incidents in which she was threatened and differing accounts of those incidents. Janelidze also variously stated that two cousins, two nephews, and two brothers were killed by

Construing the evidentiary record as a whole, we conclude that substantial evidence supports the IJ and the BIA's rulings. The fact that Janelidze was beaten and later threatened at gunpoint is troubling, but taken in context, these facts do not compel reversal of the decisions below. Although the Country Report indicates that Georgia presents difficult living conditions for Ossetians, nothing in Janelidze's evidence required a finding that she had been singled out for mistreatment based on her ethnicity. Janelidze's testimony, although inconsistent with her declaration, did not indicate that the men who attacked her ever mentioned her Ossetian ethnicity. The events described by Janelidze amount to harassment, not persecution. Further, the record does not establish any actual or imputed political opinion, nor evidence linking her actions to a political opinion. Janelidze's testimony indicates that she provided information to her relatives and to her friend David, not in an attempt to further an Ossetian rebellion, but in an attempt to protect her relatives from Georgian attacks. Given that Janelidze provided differing accounts of her conversations with these men–one account in which neither her ethnicity nor any connection to Ossetian rebels is mentioned and one account in which she is threatened because of her ethnicity and connection to the rebels–the record does not compel the conclusion that the IJ or BIA erred in

the Georgian military.

9

determining that Janelidze had failed to meet her burden of proof.

Additionally, Janelidze's and her husband's actions after these incidents leads us to believe that their fear of persecution was not subjectively genuine. Janelidze returned to the same job that brought the unwanted attention, and remained in Georgia at least one year and possibly nine years after the last incident without any further occurrence of threats or violence against her. Moreover, Janelidze's husband came to the United States a year prior to her arrival and did not request asylum. In a case in which the petitioner did not leave her home country for the U.S. until almost a month and a half after she had been shot at and experienced no further difficulties during that time period, we found those factors relevant in determining to uphold the IJ's ruling. *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1238 (11th Cir. 2006). Janelidze also left her minor son in Georgia. When family members, including minor children, have been left behind in the home country and remain there unharmed, we have found those factors relevant to the asylum analysis. *See Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006).

In sum, Janelidze failed to meet her burden of establishing past persecution or a well-founded fear of future persecution. Because Janelidze failed to establish eligibility for asylum, it follows that she failed to establish eligibility for

10

withholding of removal. *Najjar*, 257 F.3d at 1292-93. The record does not compel reversal of the IJ's and BIA's rulings. Accordingly, we deny the petition for review.

**PETITION DENIED.**